# KLEPPE, SECRETARY OF THE INTERIOR *v.* NEW MEXICO ET AL.

No. 74–1488.   Argued March 23, 1976—Decided June 17, 1976

Marshall, J., delivered the opinion for a unanimous Court.

*Deputy Solicitor General Randolph* argued the cause for appellant. With him on the briefs were *Solicitor General Bork, Assistant Attorney General Taft, Edmund B. Clark,* and *Dirk D. Snel.*

*George T. Harris, Jr.,* Special Assistant Attorney General of New Mexico, argued the cause and filed a brief for appellees.*

---

*Briefs of *amici curiae* urging reversal were filed by *Murdaugh Stuart Madden* for the Humane Society of the United States; by *Paul A. Lenzini* for the International Association of Game, Fish,

Mr. Justice Marshall delivered the opinion of the Court.

At issue in this case is whether Congress exceeded its powers under the Constitution in enacting the Wild Free-roaming Horses and Burros Act.

## I

The Wild Free-roaming Horses and Burros Act, 85 Stat. 649, 16 U. S. C. §§ 1331–1340 (1970 ed., Supp. IV), was enacted in 1971 to protect "all unbranded and unclaimed horses and burros on public lands of the United States," § 2 (b) of the Act, 16 U. S. C. § 1332 (b) (1970 ed., Supp. IV), from "capture, branding, harassment, or death." § 1, 16 U. S. C. § 1331 (1970 ed., Supp. IV). The Act provides that all such horses and burros on the public lands administered by the Secretary of the Interior through the Bureau of Land Management (BLM) or by the Secretary of Agriculture through the Forest Service are committed to the jurisdiction of the respective Secretaries, who are "directed to protect and manage [the animals] as components of the public lands . . . in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands." § 3 (a), 16 U. S. C. § 1333 (a) (1970 ed., Supp. IV). If protected horses or burros

---

and Conservation Commissioners; and by *Thomas H. Wakefield* for Hope Ryden.

*Ronald A. Zumbrun* and *John H. Findley* filed a brief for the Pacific Legal Foundation as *amicus curiae* urging affirmance.

Briefs of *amici curiae* were filed by *V. Frank Mendicino,* Attorney General, and *Sterling A. Case,* Assistant Attorney General, for the State of Wyoming et al.; by *Robert List,* Attorney General, for the Nevada State Board of Agriculture; by *Jack E. Hull* and *John C. Miller* for the Central Committee of Nevada State Grazing Boards et al.; and by *David R. Belding* and *William I. Althen* for Wild Horse Organized Assistance, Inc.

"stray from public lands onto privately owned land, the owners of such land may inform the nearest federal marshal or agent of the Secretary, who shall arrange to have the animals removed."[1] § 4, 16 U. S. C. § 1334 (1970 ed., Supp. IV).

Section 6, 16 U. S. C. § 1336 (1970 ed., Supp. IV), authorizes the Secretaries to promulgate regulations, see 36 CFR § 231.11 (1975) (Agriculture); 43 CFR pt. 4710 (1975) (Interior), and to enter into cooperative agreements with other landowners and with state and local governmental agencies in furtherance of the Act's purposes. On August 7, 1973, the Secretaries executed such an agreement with the New Mexico Livestock Board, the agency charged with enforcing the New Mexico Estray Law, N. M. Stat. Ann. § 47–14–1 et seq. (1966).[2] The agreement acknowledged the authority of the Secretaries to manage and protect the wild free-roaming horses and burros on the public lands of the United States within the State and established a procedure for evaluating the claims of private parties to ownership of such animals.

---

[1] The landowner may elect to allow straying wild free-roaming horses and burros to remain on his property, in which case he must so notify the relevant Secretary. He may not destroy any such animals, however. § 4 of the Act, 16 U. S. C. § 1334 (1970 ed., Supp. IV).

[2] Under the New Mexico law, an estray is defined as:

"Any bovine animal, horse, mule or ass, found running at large upon public or private lands, either fenced or unfenced, in the state of New Mexico, whose owner is unknown in the section where found, or which shall be fifty (50) miles or more from the limits of its usual range or pasture, or that is branded with a brand which is not on record in the office of the cattle sanitary board of New Mexico . . . ." N. M. Stat. Ann. § 47–14–1 (1966).

It is not disputed that the animals regulated by the Wild Free-roaming Horses and Burros Act are estrays within the meaning of this law.

The Livestock Board terminated the agreement three months later. Asserting that the Federal Government lacked power to control wild horses and burros on the public lands of the United States unless the animals were moving in interstate commerce or damaging the public lands and that neither of these bases of regulation was available here, the Board notified the Secretaries of its intent

> "to exercise all regulatory, impoundment and sale powers which it derives from the New Mexico Estray Law, over all estray horses, mules or asses found running at large upon public or private lands within New Mexico . . . . This includes the right to go upon Federal or State lands to take possession of said horses or burros, should the Livestock Board so desire." App. 67, 72.

The differences between the Livestock Board and the Secretaries came to a head in February 1974. On February 1, 1974, a New Mexico rancher, Kelley Stephenson, was informed by the BLM that several unbranded burros had been seen near Taylor Well, where Stephenson watered his cattle. Taylor Well is on federal property, and Stephenson had access to it and some 8,000 surrounding acres only through a grazing permit issued pursuant to § 3 of the Taylor Grazing Act, 48 Stat. 1270, as amended, 43 U. S. C. § 315b. After the BLM made it clear to Stephenson that it would not remove the burros and after he personally inspected the Taylor Well area, Stephenson complained to the Livestock Board that the burros were interfering with his livestock operation by molesting his cattle and eating their feed.

Thereupon the Board rounded up and removed 19 unbranded and unclaimed burros pursuant to the New Mexico Estray Law. Each burro was seized on the pub-

lic lands of the United States[3] and, as the director of the Board conceded, each burro fit the definition of a wild free-roaming burro under § 2 (b) of the Act. App. 43. On February 18, 1974, the Livestock Board, pursuant to its usual practice, sold the burros at a public auction. After the sale, the BLM asserted jurisdiction under the Act and demanded that the Board recover the animals and return them to the public lands.

On March 4, 1974, appellees[4] filed a complaint in the United States District Court for the District of New Mexico seeking a declaratory judgment that the Wild Free-roaming Horses and Burros Act is unconstitutional and an injunction against its enforcement. A three-judge court was convened pursuant to 28 U. S. C. § 2282.

Following an evidentiary hearing, the District Court held the Act unconstitutional and permanently enjoined the Secretary of the Interior (Secretary) from enforcing its provisions.[5] The court found that the Act "conflicts with . . . the traditional doctrines concerning wild animals," *New Mexico* v. *Morton,* 406 F. Supp. 1237, 1238 (1975), and is in excess of Congress' power under the Property Clause of the Constitution, Art. IV, § 3, cl. 2. That Clause, the court found, enables Congress to regulate wild animals found on the public land only for the *"protection* of the public lands from damage of some kind." 406 F. Supp., at 1239 (emphasis in original). Accordingly, this power was exceeded in this

---

[3] The record is somewhat unclear on this point, but appellees conceded at oral argument that all the burros were seized on the public lands of the United States. Tr. of Oral Arg. 35.

[4] Appellees are the State of New Mexico, the New Mexico Livestock Board, the Board's director, and a purchaser of three of the burros seized at Taylor Well.

[5] Since appellees did not file suit against the Secretary of Agriculture, the District Court's injunction was limited to the Secretary of the Interior, who is the appellant in this Court.

case because "[t]he statute is aimed at protecting the wild horses and burros, not at protecting the land they live on." *Ibid.*[6] We noted probable jurisdiction, 423 U. S. 818 (1975), and we now reverse.

## II

The Property Clause of the Constitution provides that "Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U. S. Const., Art. IV, § 3, cl. 2. In passing the Wild Free-roaming Horses and Burros Act, Congress deemed the regulated animals "an integral part of the natural system of the public lands" of the United States, § 1, 16 U. S. C. § 1331 (1970 ed., Supp. IV), and found that their management was necessary "for achievement of an ecological balance on the public lands." H. R. Conf. Rep. No. 92–681, p. 5 (1971). According to Congress, these animals, if preserved in their native habitats, "contribute to the diversity of life forms within the Nation and enrich the lives of the American people." § 1, 16 U. S. C. § 1331 (1970 ed., Supp. IV). See Hearing on Protection of Wild Horses and Burros on Public Lands before the Subcommittee on Public Lands of the Senate Committee on Interior and Insular Affairs, 92d Cong., 1st Sess., 69, 122, 128, 138, 169, 183 (1971). Indeed, Congress concluded, the wild free-roaming horses and burros "are living symbols of the historic

---

[6] The court also held that the Act could not be sustained under the Commerce Clause because "all the evidence establishes that the wild burros in question here do not migrate across state lines" and "Congress made no findings to indicate that it was in any way relying on the Commerce Clause in enacting this statute." 406 F. Supp., at 1239. While the Secretary argues in this Court that the Act is sustainable under the Commerce Clause, we have no occasion to address this contention since we find the Act, as applied, to be a permissible exercise of congressional power under the Property Clause.

and pioneer spirit of the West." § 1, 16 U. S. C. § 1331 (1970 ed., Supp. IV). Despite their importance, the Senate committee found:

> "[These animals] have been cruelly captured and slain and their carcasses used in the production of pet food and fertilizer. They have been used for target practice and harassed for 'sport' and profit. In spite of public outrage, this bloody traffic continues unabated, and it is the firm belief of the committee that this senseless slaughter must be brought to an end." S. Rep. No. 92–242, pp. 1–2 (1971).

For these reasons, Congress determined to preserve and protect the wild free-roaming horses and burros on the public lands of the United States. The question under the Property Clause is whether this determination can be sustained as a "needful" regulation "respecting" the public lands. In answering this question, we must remain mindful that, while courts must eventually pass upon them, determinations under the Property Clause are entrusted primarily to the judgment of Congress. *United States* v. *San Francisco,* 310 U. S. 16, 29–30 (1940); *Light* v. *United States,* 220 U. S. 523, 537 (1911) *United States* v. *Gratiot,* 14 Pet. 526, 537–538 (1840).

Appellees argue that the Act cannot be supported by the Property Clause. They contend that the Clause grants Congress essentially two kinds of power: (1) the power to dispose of and make incidental rules regarding the use of federal property; and (2) the power to protect federal property. According to appellees, the first power is not broad enough to support legislation protecting wild animals that live on federal property; and the second power is not implicated since the Act is designed to protect the animals, which are not them-

selves federal property, and not the public lands. As an initial matter, it is far from clear that the Act was not passed in part to protect the public lands of the United States [7] or that Congress cannot assert a property interest in the regulated horses and burros superior to that of the State.[8] But we need not consider whether the Act can be upheld on either of these grounds, for we reject appellees' narrow reading of the Property Clause.

Appellees ground their argument on a number of cases that, upon analysis, provide no support for their position. Like the District Court, appellees cite *Hunt* v. *United States,* 278 U. S. 96 (1928), for the proposition that the Property Clause gives Congress only the limited power to regulate wild animals in order to protect the public lands from damage. But *Hunt,* which upheld the Government's right to kill deer that were damaging foliage in the national forests, only holds that damage to the land is a sufficient basis for regulation; it contains no suggestion that it is a necessary one.

Next, appellees refer to *Kansas* v. *Colorado,* 206 U. S. 46, 89 (1907). The referenced passage in that case states that the Property Clause "clearly . . . does not grant to Congress any legislative control over the States, and must, so far as they are concerned, be limited to authority over the property belonging to the United States within their limits." But this does no more than articulate the obvious: The Property Clause is a

---

[7] Congress expressly ordered that the animals were to be managed and protected in order "to achieve and maintain a thriving natural ecological balance on the public lands." § 3 (a), 16 U. S. C. § 1333 (a) (1970 ed., Supp. IV). Cf. *Hunt* v. *United States,* 278 U. S. 96 (1928).

[8] See *infra,* at 545–546. The Secretary makes no claim here, however, that the United States owns the wild free-roaming horses and burros found on public land.

grant of power only over federal property. It gives no indication of the kind of "authority" the Clause gives Congress over its property.

*Camfield* v. *United States,* 167 U. S. 518 (1897), is of even less help to appellees. Appellees rely upon the following language from *Camfield:*

> "While we do not undertake to say that Congress has the unlimited power to legislate against nuisances within a State, which it would have within a Territory, we do not think the admission of a Territory as a State deprives it of the power of legislating for the protection of the public lands, though it may thereby involve the exercise of what is ordinarily known as the police power, *so long as such power is directed solely to its own protection."* *Id.,* at 525–526 (emphasis added).

Appellees mistakenly read this language to limit Congress' power to regulate activity on the public lands; in fact, the quoted passage refers to the scope of congressional power to regulate conduct on *private* land that affects the public lands. And *Camfield* holds that the Property Clause is broad enough to permit federal regulation of fences built on private land adjoining public land when the regulation is for the protection of the federal property. *Camfield* contains no suggestion of any limitation on Congress' power over conduct on its own property; its sole message is that the power granted by the Property Clause is broad enough to reach beyond territorial limits.

Lastly, appellees point to dicta in two cases to the effect that, unless the State has agreed to the exercise of federal jurisdiction, Congress' rights in its land are "only the rights of an ordinary proprietor . . . ." *Fort Leavenworth R. Co.* v. *Lowe,* 114 U. S. 525, 527 (1885).

See also *Paul* v. *United States,* 371 U. S. 245, 264 (1963). In neither case was the power of Congress under the Property Clause at issue or considered and, as we shall see, these dicta fail to account for the raft of cases in which the Clause has been given a broader construction.[9]

In brief, beyond the *Fort Leavenworth* and *Paul* dicta, appellees have presented no support for their position that the Clause grants Congress only the power to dispose of, to make incidental rules regarding the use of, and to protect federal property. This failure is hardly surprising, for the Clause, in broad terms, gives Congress the power to determine what are "needful" rules "respecting" the public lands. *United States* v. *San Francisco,* 310 U. S., at 29–30; *Light* v. *United States,* 220 U. S., at 537; *United States* v. *Gratiot,* 14 Pet., at 537–538. And while the furthest reaches of the power granted by the Property Clause have not yet been definitively resolved, we have repeatedly observed that "[t]he power over the public land thus entrusted to Congress is without limitations." *United States* v. *San Francisco, supra,* at 29. See *Ivanhoe Irrig. Dist.* v. *McCracken,* 357 U. S. 275, 294–295 (1958); *Alabama* v. *Texas,* 347 U. S. 272, 273 (1954); *FPC* v. *Idaho Power Co.,* 344 U. S. 17, 21 (1952); *United States* v. *California,* 332 U. S. 19, 27 (1947); *Gibson* v. *Chouteau,* 13 Wall. 92, 99 (1872); *United States* v. *Gratiot, supra,* at 537.

The decided cases have supported this expansive reading. It is the Property Clause, for instance, that pro-

---

[9] Indeed, *Hunt* v. *United States, supra,* and *Camfield* v. *United States,* 167 U. S. 518 (1897), both relied upon by appellees, are inconsistent with the notion that the United States has only the rights of an ordinary proprietor with respect to its land. An ordinary proprietor may not, contrary to state law, kill game that is damaging his land, as the Government did in *Hunt;* nor may he prohibit the fencing in of his property without the assistance of state law, as the Government was able to do in *Camfield.*

vides the basis for governing the Territories of the United States. *Hooven & Allison Co.* v. *Evatt,* 324 U. S. 652, 673–674 (1945); *Balzac* v. *Porto Rico,* 258 U. S. 298, 305 (1922); *Dorr* v. *United States,* 195 U. S. 138, 149 (1904); *United States* v. *Gratiot, supra,* at 537; *Sere* v. *Pitot,* 6 Cranch 332, 336–337 (1810). See also *Vermilya-Brown Co.* v. *Connell,* 335 U. S. 377, 381 (1948). And even over public land within the States, "[t]he general Government doubtless has a power over its own property analogous to the police power of the several States, and the extent to which it may go in the exercise of such power is measured by the exigencies of the particular case." *Camfield* v. *United States, supra,* at 525. We have noted, for example, that the Property Clause gives Congress the power over the public lands "to control their occupancy and use, to protect them from trespass and injury and to prescribe the conditions upon which others may obtain rights in them . . . ." *Utah Power & Light Co.* v. *United States,* 243 U. S. 389, 405 (1917). And we have approved legislation respecting the public lands "[i]f it be found to be necessary for the protection of the public, or of intending settlers [on the public lands]." *Camfield* v. *United States, supra,* at 525. In short, Congress exercises the powers both of a proprietor and of a legislature over the public domain. *Alabama* v. *Texas, supra,* at 273; *Sinclair* v. *United States,* 279 U. S. 263, 297 (1929); *United States* v. *Midwest Oil Co.,* 236 U. S. 459, 474 (1915). Although the Property Clause does not authorize "an exercise of a general control over public policy in a State," it does permit "an exercise of the complete power which Congress has over particular public property entrusted to it." *United States* v. *San Francisco, supra,* at 30 (footnote omitted). In our view, the "complete power" that

Congress has over public lands necessarily includes the power to regulate and protect the wildlife living there.[10]

## III

Appellees argue that if we approve the Wild Free-roaming Horses and Burros Act as a valid exercise of Congress' power under the Property Clause, then we have sanctioned an impermissible intrusion on the sovereignty, legislative authority, and police power of the State and have wrongly infringed upon the State's traditional trustee powers over wild animals. The argument appears to be that Congress could obtain exclusive legislative jurisdiction over the public lands in the State only by state consent, and that in the absence of such consent Congress lacks the power to act contrary to state law. This argument is without merit.

Appellees' claim confuses Congress' derivative legis-

---

[10] Appellees ask us to declare that the Act is unconstitutional because the animals are not, as Congress found, "fast disappearing from the American scene." § 1, 16 U. S. C. § 1331 (1970 ed., Supp. IV). At the outset, no reason suggests itself why Congress' power under the Property Clause to enact legislation to protect wild free-roaming horses and burros "from capture, branding, harassment, or death," *ibid.*, must depend on a finding that the animals are decreasing in number. But responding directly to appellees' contention, we note that the evidence before Congress on this question was conflicting and that Congress weighed the evidence and made a judgment. See Hearing on Protection of Wild Horses and Burros on Public Lands before the Subcommittee on Public Lands of the House Committee on Interior and Insular Affairs, 92d Cong., 1st Sess., 1–2, 7, 11–14, 17, 26–32, 80, 87–88, 101, 103, 134–136, 139–141 (1971). What appellees ask is that we reweigh the evidence and substitute our judgment for that of Congress. This we must decline to do. *United States* v. *San Francisco*, 310 U. S. 16, 29–30 (1940); *Light* v. *United States*, 220 U. S. 523, 537 (1911); *United States* v. *Gratiot*, 14 Pet. 526, 537–538 (1840). See also *Clark* v. *Paul Gray, Inc.*, 306 U. S. 583, 594 (1939). In any event, we note that Congress has provided for periodic review of the administration of the Act. § 10, 16 U. S. C. § 1340 (1970 ed., Supp. IV).

lative powers, which are not involved in this case, with its powers under the Property Clause. Congress may acquire derivative legislative power from a State pursuant to Art. I, § 8, cl. 17, of the Constitution by consensual acquisition of land, or by nonconsensual acquisition followed by the State's subsequent cession of legislative authority over the land. *Paul* v. *United States,* 371 U. S., at 264; *Fort Leavenworth R. Co.* v. *Lowe,* 114 U. S., at 541–542.[11] In either case, the legislative jurisdiction acquired may range from exclusive federal jurisdiction with no residual state police power, *e. g., Pacific Coast Dairy* v. *Dept. of Agriculture of Cal.,* 318 U. S. 285 (1943), to concurrent, or partial, federal legislative jurisdiction, which may allow the State to exercise certain authority. *E. g., Paul* v. *United States, supra,* at 265; *Collins* v. *Yosemite Park Co.,* 304 U. S. 518, 528–530 (1938); *James* v. *Dravo Contracting Co.,* 302 U. S. 134, 147–149 (1937).

But while Congress can acquire exclusive or partial jurisdiction over lands within a State by the State's consent or cession, the presence or absence of such jurisdiction has nothing to do with Congress' powers under the

---

[11] Article I, § 8, cl. 17, of the Constitution provides that Congress shall have the power:

"To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of Particular States, and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings . . . ."

The Clause has been broadly construed, and the acquisition by consent or cession of exclusive or partial jurisdiction over properties for any legitimate governmental purpose beyond those itemized is permissible. *Collins* v. *Yosemite Park Co.,* 304 U. S. 518, 528–530 (1938).

Property Clause. Absent consent or cession a State undoubtedly retains jurisdiction over federal lands within its territory, but Congress equally surely retains the power to enact legislation respecting those lands pursuant to the Property Clause. *Mason Co.* v. *Tax Comm'n of Washington,* 302 U. S. 186, 197 (1937); *Utah Power & Light Co.* v. *United States,* 243 U. S., at 403–405; *Ohio* v. *Thomas,* 173 U. S. 276, 283 (1899). And when Congress so acts, the federal legislation necessarily overrides conflicting state laws under the Supremacy Clause. U. S. Const., Art. VI, cl. 2. See *Hunt* v. *United States,* 278 U. S., at 100; *McKelvey* v. *United States,* 260 U. S. 353, 359 (1922). As we said in *Camfield* v. *United States,* 167 U. S., at 526, in response to a somewhat different claim: "A different rule would place the public domain of the United States completely at the mercy of state legislation."

Thus, appellees' assertion that "[a]bsent state consent by complete cession of jurisdiction of lands to the United States, exclusive jurisdiction does not accrue to the federal landowner with regard to federal lands within the borders of the State," Brief for Appellees 24, is completely beside the point; and appellees' fear that the Secretary's position is that "the Property Clause totally exempts federal lands within state borders from state legislative powers, state police powers, and all rights and powers of local sovereignty and jurisdiction of the states," *id.,* at 16, is totally unfounded. The Federal Government does not assert exclusive jurisdiction over the public lands in New Mexico, and the State is free to enforce its criminal and civil laws on those lands. But where those state laws conflict with the Wild Free-roaming Horses and Burros Act, or with other legislation passed pursuant to the Property Clause, the law is clear: The state laws must recede. *McKelvey* v. *United States, supra,* at 359.

Again, none of the cases relied upon by appellees are to the contrary. *Surplus Trading Co.* v. *Cook,* 281 U. S. 647, 650 (1930), merely states the rule outlined above that, "without more," federal ownership of lands within a State does not withdraw those lands from the jurisdiction of the State. Likewise, *Wilson* v. *Cook,* 327 U. S. 474, 487–488 (1946), holds only that, in the absence of consent or cession, the Federal Government did not acquire exclusive jurisdiction over certain federal forest reserve lands in Arkansas and the State retained legislative jurisdiction over those lands. No question was raised regarding Congress' power to regulate the forest reserves under the Property Clause. And in *Colorado* v. *Toll,* 268 U. S. 228, 230–231 (1925), the Court found that Congress had not purported to assume jurisdiction over highways within the Rocky Mountain National Park, not that it lacked the power to do so under the Property Clause.[12]

---

[12] Referring to the Act creating the National Park, the Court said:

"There is no attempt to give exclusive jurisdiction to the United States, but on the contrary the rights of the State over the roads are left unaffected in terms. Apart from those terms the State denies the power of Congress to curtail its jurisdiction or rights without an act of cession from it and an acceptance by the national government. The statute establishing the park would not be construed to attempt such a result. As the [park superintendent] is undertaking to assert exclusive control and to establish a monopoly in a matter as to which, if the allegations of the bill are maintained, the State has not surrendered its legislative power, a cause of action is disclosed if we do not look beyond the bill, and it was wrongly dismissed." 268 U. S., at 231 (citations omitted).

While Colorado thus asserted that, absent cession, the Federal Government lacked power to regulate the highways within the park, and the Court held that the State was entitled to attempt to prove that it had not surrendered legislative jurisdiction to the United States, at most the case stands for the proposition that where

In short, these cases do not support appellees' claim that upholding the Act would sanction an impermissible intrusion upon state sovereignty. The Act does not establish exclusive federal jurisdiction over the public lands in New Mexico; it merely overrides the New Mexico Estray Law insofar as it attempts to regulate federally protected animals. And that is but the necessary consequence of valid legislation under the Property Clause.

Appellees' contention that the Act violates traditional state power over wild animals stands on no different footing. Unquestionably the States have broad trustee and police powers over wild animals within their jurisdictions. *Toomer* v. *Witsell,* 334 U. S. 385, 402 (1948); *Lacoste* v. *Department of Conservation,* 263 U. S. 545, 549 (1924); *Geer* v. *Connecticut,* 161 U. S. 519, 528 (1896). But, as *Geer* v. *Connecticut* cautions, those powers exist only "in so far as [their] exercise may be not incompatible with, or restrained by, the rights conveyed to the Federal government by the Constitution." *Ibid.* "No doubt it is true that as between a State and its inhabitants the State may regulate the killing and sale of [wildlife], but it does not follow that its authority is exclusive of paramount powers." *Missouri* v. *Holland,* 252 U. S. 416, 434 (1920). Thus, the Privileges and Immunities Clause, U. S. Const., Art. IV, § 2, cl. 1, precludes a State from imposing prohibitory licensing fees on non-residents shrimping in its waters, *Toomer* v. *Witsell, supra;* the Treaty Clause, U. S. Const., Art. II, § 2, permits Congress to enter into and enforce a treaty to protect migratory birds despite state objections, *Missouri* v. *Holland, supra;* and the Property Clause gives Congress the power to thin overpopulated herds of deer on federal

Congress does not purport to override state power over public lands under the Property Clause and where there has been no cession, a federal official lacks power to regulate contrary to state law.

lands contrary to state law. *Hunt* v. *United States,* 278 U. S. 96 (1928). We hold today that the Property Clause also gives Congress the power to protect wildlife on the public lands, state law notwithstanding.

## IV

In this case, the New Mexico Livestock Board entered upon the public lands of the United States and removed wild burros. These actions were contrary to the provisions of the Wild Free-roaming Horses and Burros Act. We find that, as applied to this case, the Act is a constitutional exercise of congressional power under the Property Clause. We need not, and do not, decide whether the Property Clause would sustain the Act in all of its conceivable applications.

Appellees are concerned that the Act's extension of protection to wild free-roaming horses and burros that stray from public land onto private land, § 4, 16 U. S. C. § 1334 (1970 ed., Supp. IV), will be read to provide federal jurisdiction over every wild horse or burro that at any time sets foot upon federal land. While it is clear that regulations under the Property Clause may have some effect on private lands not otherwise under federal control, *Camfield* v. *United States,* 167 U. S. 518 (1897), we do not think it appropriate in this declaratory judgment proceeding to determine the extent, if any, to which the Property Clause empowers Congress to protect animals on private lands or the extent to which such regulation is attempted by the Act. We have often declined to decide important questions regarding "the scope and constitutionality of legislation in advance of its immediate adverse effect in the context of a concrete case," *Longshoremen* v. *Boyd,* 347 U. S. 222, 224 (1954), or in the absence of "an adequate and full-bodied record." *Public Affairs Press* v. *Rickover,* 369 U. S. 111, 113 (1962). Cf. *Eccles* v. *Peoples Bank,* 333 U. S. 426

(1948). We follow that course in this case and leave open the question of the permissible reach of the Act over private lands under the Property Clause.

For the reasons stated, the judgment of the District Court is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*