**UNITED STATES of America, Plaintiff,**

**v.**

**Arch A. MOORE, Jr., et al, Defendants.**

**Civ. A. No. 2:86–0724.**

United States District Court,
S.D. West Virginia,
Charleston Division.

July 22, 1986.

---

**165**

Sarah G. Sullivan and Gary E. Pullin, Asst. U.S. Attys., Charleston, W. Va., F. Henry Habicht, II and Dorothy R. Burakries, Attys., Land & Resources Div., U.S. Dept. of Justice, Washington, D.C., for plaintiff.

Charles G. Brown, Atty. Gen., Kristi Treadway, Deputy Atty. Gen., Environment & Energy Div., Barbara Freedy, Deputy Atty. Gen., Dept. of Health, Charleston, W. Va., for defendants.

## MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

Pending in this declaratory judgment action is the motion of the Defendants to dismiss and the motion of the Plaintiff for summary judgment. The parties have briefed the issues and presented oral argument. The Court, finding no genuine issue of material fact, grants the motion of the Plaintiff for the reasons set forth herein.

### I. *Background*

The facts relevant to the Court's decision today are not complex. The United States seeks to prevent the Governor of West Virginia and the Director of West Virginia's Department of Natural Resources (hereinafter collectively referred to as "the State") from spraying the pesticide, Bacillus thuringiensis isrealensis (BTI), inside the boundaries of the New River Gorge National River without a National Park Service (NPS) permit. The State desires to spray the pesticides "to reduce and remove the *similium jenningsi* [commonly called gnat or black fly] from the southern counties of West Virginia." Executive Order No. 7–86, Arch A. Moore, Jr., Governor of West Virginia. The New River is in the region intended for spraying.[1]

---

1. It is the belief of the State officials that the black fly problem cannot be effectively eliminated without spraying inside the boundaries of the National River.

The New River Gorge National River ("National River") was established by Act of Congress on November 10, 1978. Public Law 95–625, 16 U.S.C. §§ 460M–15 through 460M–25. The National Park Service [2] operates the National River as a unit of the National Park System. It contains approximately 63,000 acres along 52 miles of the New River in southern West Virginia. Only 6,000 acres of the area designated as the National River are federally owned.

## II. *Discussion*

The State argued in an earlier memorandum that it has concurrent jurisdiction with the United States over the National River. The State recognizes the authority of the Department of the Interior to administer the National River, but argues that such authority and jurisdiction are not exclusive. In support of its position, the State submits that ownership of the river bed and all wild animals are vested in it as the State sovereign. Moreover, the State stresses the responsibility of the State officials for the health and well being of the citizens of West Virginia and the State's inherent police power to protect same.

■ As indicated to counsel at a conference following an earlier hearing, the Court finds the State's arguments on the extent of its jurisdiction to be unpersuasive. It is true as a general proposition that a state may have concurrent jurisdiction over a federal preserve, but as one court has observed, "In protecting the park property it is immaterial that the United States does not have exclusive jurisdiction over the lands within [a national park]." *New Mexico State Game Commission v. Udall*, 410 F.2d 1197, 1201 (10th Cir.1969). Federal law, as the Constitution makes clear, is superior to that of a state. Specifically, the property clause of the Constitution, Article IV, § 3, cl. 2, expressly empowers Congress to "make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States...." The Supreme Court has given the property clause an expansive reading and has held that the "power over the public lands thus entrusted to Congress is without limitations." *Kleppe v. New Mexico*, 426 U.S. 529, 539, 96 S.Ct. 2285, 2291, 49 L.Ed.2d 34 (1976).

■ In line with the Supreme Court's interpretation of the property clause, the Eighth Circuit has held that clause to authorize regulation of conduct outside of federally owned lands if such conduct would threaten the designated purpose of the federal land. *Minnesota v. Block*, 660 F.2d 1240 (8th Cir.1981), *cert. denied*, 455 U.S. 1007, 102 S.Ct. 1645, 71 L.Ed.2d 876 (1982). Hence, the authority of the United States is not limited to the 6,000 acres of which it has legal title; it also includes the 60,000 acres designated as the National River.[3] Moreover, the power of the United States to regulate and protect the wildlife living on the federally controlled property cannot be questioned. *New Mexico State Game Commission v. Udall*, 410 F.2d 1197 (10th Cir.1969); *Organized Fishermen of Florida v. Andrus*, 488 F.Supp. 1351 (S.D. Fla.1980). As reflected in the holdings of the above cases, Congress has acted upon its constitutional authority by enacting statutes giving the Secretary of the Interior great discretion in managing the National Park System. The Secretary is authorized to "make and publish such rules and regulations as he may deem necessary or proper for the use and management of the parks, monuments, and reservations under the jurisdiction of the National Park Service...." 16 U.S.C. § 3. The Secretary "may also provide in his discretion for the destruction of such animals and of such plant life as may be detrimental to the use of any of said parks, monuments, or reservations." *Id.* Of specific application to this case, he is authorized to "promulgate

---

**2.** The National Park Service is a division of the Department of the Interior.

**3.** The federal preserve in *Block* was also comprised of a substantial amount of state and privately owned land.

and enforce regulations concerning boating *and other activities on or relating to waters* located within areas of the National Park System, including waters subject to the jurisdiction of the United States." 16 U.S.C. § 1a–2(h) (emphasis added). Finally, the initial provision in the Act creating the New River Gorge National River refers to the above statutory provisions and provides "that any other statutory authority available to the Secretary for the preservation and management of natural resources may be utilized to the extent he finds such authority will further the purposes of [the New River Gorge National River Act]." 16 U.S.C. § 460M–15.

■ The State attempts to side-step the above statutory authority by arguing that the Secretary has not taken the steps under his grant of authority to ban pesticide spraying in the National River. The Court disagrees.

It is true that the regulations promulgated by the Secretary and codified in the Code of Federal Regulations do not specifically refer to the use of pesticides in the National Park System, but other regulations have the effect of restricting the use of pesticides. Foremost is the regulation found at 36 C.F.R. § 2.1(a). It provides as follows:

"Except as otherwise provided in this chapter, the following is prohibited:

(1) Possessing, destroying, injuring, defacing, removing, digging, or disturbing from its natural state:

(i) living or dead wildlife or fish, or the parts of products thereof, such as antlers or nests."

Because black flies—however pesky or annoying they may be to human population—are clearly "wildlife", this regulation effects a ban on their destruction absent other authority.

Elsewhere in the applicable regulations is a provision for obtaining a permit[4] for

an otherwise prohibited activity. The regulation provides that "[w]hen authorized by regulations set forth in this chapter, the superintendent may issue a permit to authorize an otherwise prohibited or restricted activity or impose a public use limit." 36 C.F.R. § 1.6(a). The United States points to this provision and proclaims the obligation of the State to obtain a permit. The State, on the other hand, isolates the beginning phrase, "[w]hen authorized by regulations set forth in this chapter," notes that there is no explicit authorization, and concludes that no permit is required. The Court agrees with the State's observation regarding the condition precedent to the regulation, but it cannot accept the State's conclusion.

The reasoning of the State proves too much. If its contention is that that above quoted regulation does not allow a permit to be issued, then it would appear to be without recourse. It must be remembered that the regulation first cited, 36 C.F.R. § 2.1, stands as a complete bar to destruction of wildlife, e.g., black flies. If the State cannot get a permit to spray the black flies, or find another statutory or regulatory provision, which nullifies 36 C.F.R. § 2.1, then it cannot go forward with its spraying program. The State, or the United States for that matter, has not identified other authority which would allow the Secretary to issue a permit for spraying. Nevertheless, the Court believes that authority to exist.

Earlier the Court quoted a portion of 16 U.S.C. § 3. For purposes of explanation, it is repeated here.

"[The Secretary] may also provide in his discretion for the destruction of such animals and of such plant life as may be detrimental to the use of any of said parks, monuments, or reservations."

By the words used, the Court discerns a legislative intent to posit much discretion in the hands of the Secretary and his under-

---

4. " 'Permit' means a written authorization to engage in uses or activities that are otherwise prohibited, restricted, or regulated." 36 C.F.R. § 1.4(a).

lings, including the Director of the National Park Service. Admittedly, the statute does not speak of permits or regulations being promulgated, but the Court, nevertheless, believes it to be sufficient authority for the procedures that the National Park Service has declared to be proper.

While the Secretary has not promulgated regulations on the use of pesticides in the National Park Service, he has established quite specific official policies pertaining to such use. For instance, the "Management Policies" of the National Park Service provides as follows:

"Chemical pesticides of any type will be used only where feasible alternatives are not available or acceptable. The Service's use of all pesticides shall be approved by the Director. Application shall be in accordance with applicable laws, Departmental and Service guidelines, and Environmental Protectional Agency and Occupational Health and Safety Administration regulations."

Department of the Interior, National Park Service, Management Policies, p. IV–13 (1978).

As to the use of pesticides, the Service policies direct as follows:

"Native insects and diseases existing under natural conditions are natural elements of the ecosystem. Accordingly, populations of native insects and the incidence of native diseases will be allowed to function unimpeded except where control is required (1) to prevent the loss of the host or host-dependent species from the ecosystem; (2) to prevent outbreaks of the insect or disease from spreading to forests, trees, other vegetative communities or animal populations outside the area; (3) to conserve threatened or endangered, or unique plant specimens or communities: (4) to conserve and protect flora and fauna in developed zones; or (5) for reasons of public health and safety."

*Id.* at IV–XII. Finally, the departmental manual of the Department of Interior provides further guidelines for pesticide use. All of these policies and guidelines, the Court believes have been developed pursuant to authority granted the Secretary for controlling animal life in the national park system.

Before this Court, the State argued that the black fly is a public health problem in the southern counties of West Virginia. This assertion may be true, but it is one which must in the first instance be made to the Secretary of the Interior or the National Park Service. If the State is unsuccessful and believes the administrative agency to have acted in an arbitrary and capricious manner, it may return to the Court to have the administrative proceedings reviewed. *Motor Vehicle Manufacturer's Association v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

### III. *Conclusion*

For the foregoing reasons, the Court grants the motion of the Plaintiff for summary judgment and denies the Defendants' motion to dismiss. A Judgment Order, consistent with this opinion, will be entered herewith declaring the rights of the parties.

The Clerk is directed to send a certified copy of this Memorandum and Order to counsel of record.