# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-1190

_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Appellee, | * |
| | * |
| v. | * |
| | * |
| Harold M. Armstrong, | * |
| also known as "Bo," | * |
| | * |
| Appellant. | * |
| | * |

Appeals from the United States
District Court for the
District of Minnesota.

_____

| | |
|---|---|
| State of Minnesota; | * |
| | * |
| Amicus on Behalf of Appellant, | * |
| | * |
| | * |
| Voyageurs Region National Park | * |
| Association; The Wilderness Society; | * |
| The National Parks and Conservation | * |
| Association. | * |
| | * |
| Amici on Behalf of Appellee. | * |

_____

No. 99-1191

_____

United States of America,            *
                                     *
                    Appellee,        *
                                     *
        v.                           *
                                     *
Carl E. Brown,                       *
                                     *
                    Appellant.       *
                                     *


_____

State of Minnesota;                  *
                                     *
    Amicus on Behalf of Appellant,   *
                                     *
                                     *
Voyageurs Region National Park       *
Association; The Wilderness Society; *
The National Parks and Conservation  *
Association.                         *
                                     *
    Amici on Behalf of Appellee.     *

_____

Submitted:  May 12, 1999

Filed:  July 28, 1999

_____

-2-

Before McMILLIAN, HEANEY, and FAGG, Circuit Judges.
_____

HEANEY, Circuit Judge.

Carl Brown and Harold "Bo" Armstrong were convicted in the United States District Court for the District of Minnesota for violating a National Park Service (NPS) regulation that prohibits conducting business operations on Rainy Lake in Voyageurs National Park (VNP) without a permit. We affirm their convictions and the sentences imposed, except that the sentence imposed on Carl Brown must be modified on remand with respect to that portion of his sentence that prohibits him from entering VNP for any purpose.

## I. Background

The VNP concept dates back to 1891 when the Minnesota Legislature requested that the President of the United States establish a national park in Minnesota between Crane Lake on the east and Lake of the Woods on the west. See 1891 Minn. General Laws 402-03. Progress was slow, with no significant action occurring on the request until 1960 when the state asked the NPS to study the possibility of establishing a national park within the same area. See S. Rep. No. 91-1513 (1970), reprinted in 1970 U.S.C.C.A.N. 5965, 5966-67. In 1964, the area was recommended for national park designation by the NPS. See id. In 1968, Representative John A. Blatnik introduced enabling legislation to establish VNP in the House of Representatives. The bill died that year but was revived in 1969. See Voyageurs Is First Water-Based Park, Duluth News-Tribune, Jan. 24, 1971.

The establishment of VNP was authorized by the Voyageurs National Park bill ("the bill") and made contingent upon the donation by Minnesota to the Secretary of the Interior of some 25,000 acres of state-owned land lying within the boundaries of

the 219,000 acre park (comprised of 139,000 acres of land and 80,000 acres of water). See S. Rep. No. 91-1513 (1970), reprinted in 1970 U.S.C.C.A.N. 5965, 5965, 5967. The bill was passed by the House on October 5, 1970, by the Senate with minor changes on December 21, 1970, and received final approval by Congress on December 29, 1970, when the House approved the Senate's changes. See 116 Cong. Rec. 34,798, 34,806, 43,248, 43,773 (1970). Congressman John A. Blatnik of Chisholm, Minnesota, who first introduced the bill in Congress in 1968, was the principal author of the legislation in the House of Representatives and Walter F. Mondale was the principal author in the Senate. The legislation was signed into law as Public Law 91-661 by President Richard M. Nixon on January 8, 1971. See Nixon Signs Voyageurs Park Bill, Duluth News-Tribune, Jan. 9, 1971.

As an active participant in the creation of VNP, the state of Minnesota passed the necessary land donation legislation required to meet the conditions set forth in Public Law 91-661 and otherwise encouraged the development of the park. See Minn. Stat. §§ 84B.01-.10 (1971). That legislation, which donated all state lands within the boundaries of the proposed VNP to the United States for the purpose of creating the park, passed the Minnesota House of Representatives on May 12, 1971, with a 108-26 vote, and the Minnesota Senate on May 16, 1971, on a 49-16 vote. See Einer Karlstrand, Senate Approves Amended Voyageurs National Park Bill, Duluth News-Tribune, May 16, 1971, at 1. On June 4, 1971, Governor Wendell Anderson signed the legislation into state law. See Einar Karlstrand, Voyageurs Bill Signed By Governor, Duluth Herald, June 4, 1971. VNP was officially established by the Secretary of the Interior on April 8, 1975. See 40 Fed. Reg. 15,921-22 (1975).

VNP lies along the international boundary between the United States and Canada, just east of International Falls, Minnesota. See S. Rep. No. 91-1513 (1970), reprinted in 1970 U.S.C.C.A.N. 5965, 5965. The water portion of VNP is dominated by four large lakes, Rainy, Kabetogama, Namakin, and Crane. See Map, Appendix 1. Those four lakes, along with hundreds of smaller lakes, were gouged out of the

landscape by the great ice sheets that shaped this entire region thousands of years ago. Taken together, these lakes and the network of connecting waterways make this region a unique and beautiful setting for a national park. See S. Rep. No. 91-1513 (1970), reprinted in 1970 U.S.C.C.A.N. 5965, 5965. The northern boundary of VNP bisects Rainy Lake and also constitutes the border between the United States and Canada. Most of the dry-land surface of VNP is located on, or near, the Kabetogama Peninsula (103,850 acres), with a remaining portion (35,280 acres) lying within the then-bounded Superior National Forest. See id.

The federal legislation creating VNP memorialized the voyageurs who traversed the land and waters along Minnesota's border with Canada:

> The purpose of this subchapter is to preserve, for the inspiration and enjoyment of present and future generations, the outstanding scenery, geological conditions, and waterway system which constituted a part of the historic route of the Voyageurs who contributed significantly to the opening of the Northwestern United States.

16 U.S.C. § 160 (emphasis added).[1]

---

[1]Between 1981 and 1986, approximately 1,060,000 persons visited the park. See NPS Decade Reports, Recreation Visits 1981-1990 (last modified Feb. 25, 1999) <http://www.aqd.nps.gov/stats/dec8190>. In 1997, 230,000 visits were recorded and in 1998, 250,000 visits were recorded. See NPS, Voyageurs NP 1997, 1998 (last modified July 17, 1998) <http://www.aqd.nps.gov/cgi-bin/ndCGI.exe/stats/Search Page>. Thus, approximately 200,000 persons visited VNP during these time periods. Each person spent approximately $67.50 per day. See Kenneth Hornback, Voyageurs National Park 1995 Summer Visitor Use Survey (visited June 21, 1999) <http://www.nps.gov/voya/research.htm#soc>. The visits are substantially below the estimates of 1.4 million visits per year projected by the NPS at the time VNP was established. See 1.4 Million Expected to Visit Voyageurs the First Year, Duluth Herald, Apr. 14, 1971, at 1.

Since at least December 29, 1966–some four and one-half years before the state's donation of the land required by Public Law 91-661–an NPS regulation governing business operations with national parks has been in effect:

> Engaging in or soliciting any business in park areas, except in accordance with the provisions of a permit, contract, or other written agreement with the United States, except as such may be specifically authorized under special regulations applicable to a park area, is prohibited.

36 C.F.R. § 5.3 (1998); see 31 Fed. Reg. 16,660, 16,661 (1966) (same).

As of August 10, 1996, the Secretary had given only one permit for the operation of a tour boat (a business operation) on Rainy Lake Basin. Brown applied for a tour boat permit and was denied the same by the NSP. Armstrong did not make a similar application. Both were arrested on Rainy Lake on August 10, 1996 for operating a tour boat within VNP without a permit. After a trial before a United States Magistrate on December 10-11, 1997, a judgment finding Brown and Armstrong guilty of operating a business on VNP waters without a permit was entered on April 17, 1998. The defendants appealed their convictions to the United States District Court for the District of Minnesota and that court affirmed by written order on January 5, 1999.

Brown was sentenced to 60 days incarceration and a $5,000 fine. The incarceration and the fine were stayed on the condition that Brown not violate any of the terms of his unsupervised probation. One of the terms of Brown's probation barred his presence in VNP except pursuant to an NPS permit for conducting business operations. Armstrong was sentenced to 30 days incarceration and fined $300. His incarceration was also stayed for one year during which time he was placed on unsupervised probation.

-6-

Brown contended in the district court and contends on appeal that the Secretary lacked authority to regulate commercial operations on Rainy Lake and that therefore his conviction must be set aside. He also contends that his sentence represented cruel and unusual punishment under the Eighth Amendment. The district court held that his conviction was valid as the NPS has jurisdiction over waters within the boundaries of VNP based on Minnesota's implied cession of jurisdiction over these waters. The court further decided that the NPS citation of Brown was a proper exercise of its jurisdiction under the property and commerce clauses of the United States Constitution. Finally, the court ruled that the regulations respecting permits violated neither the Webster-Ashburton Treaty of 1842 nor the Root-Bryce Treaty of 1909.

Armstrong, a Canadian citizen, challenged his conviction contending, as did Brown, that the NPS did not have authority to regulate commercial operations in international waters within VNP, and that, in any event, the regulations violated the Webster-Ashburton Treaty of 1842 and the Root-Bryce Treaty of 1909. His arguments were also rejected by the district court. Armstrong renews those arguments on appeal.

## II. **Minnesota's Cession of Jurisdiction to the NPS**

In United States v. Brown, 552 F.2d 817, 819 (8th Cir.) (Brown I), cert. denied, 431 U.S. 949 (1977), we decided the United States has jurisdiction to enforce regulations controlling activities on waters within the boundaries of VNP. We reasoned that the state of Minnesota had ceded jurisdiction of the waters within VNP to the United States, and noted that the state "was an active participant in the creation of the Voyageur's National Park," passing enabling legislation and otherwise encouraging the development of VNP. See id. at 821. We called attention to the enabling legislation passed by the Minnesota Legislature in 1971, which stated:

> The legislature concurs with the stated purpose of . . . sections 84B.01 to
> 84B.10 to preserve, for the inspiration and enjoyment of present and

future generations, the outstanding scenery, geologic conditions and <u>waterway system which constituted a part of the historic route of the voyageurs</u>, who contributed significantly to the opening of the northwestern United States . . . . Sections 84B.01 to 84B.10 are a necessary first step in the establishment of the park and is in furtherance of the provisions of section 101 of the act of Congress authorizing the establishment of the park.

<u>See</u> <u>id.</u> (emphasis added).

We are obligated to follow this court's decision in <u>Brown I</u>, and reaffirm its central holding without reservation. We remain of the view that <u>Brown I</u> correctly decided the cession issue and that this action by the state of Minnesota supports the convictions, regardless of the merits of appellants' other arguments. Accordingly, this opinion affirms the judgment of the district court on the ground that the state of Minnesota consented to the NPS's exercise of jurisdiction over business operations within VNP, including the operation of tour boats.

The state of Minnesota initiated the creation of a national park from lands within its bounds. In 1971, Congress succumbed to the entreaties of the state and authorized the establishment of VNP subject to two relevant preconditions. First, that VNP would not be established or a legal description of its boundaries published unless the state transferred state-owned lands within the proposed boundaries to the Secretary of the Interior (Secretary). <u>See</u> 16 U.S.C. § 160a.

Second, that VNP would be established only when "the Secretary deems sufficient interests in lands or waters have been acquired for administration in accordance with the purposes of this subchapter." 16 U.S.C. § 160a. Prior to passage of the act in January 1971, the state was put on notice of Congress' intentions and the prerequisite expectations to be satisfied by the state were the deal to go through and the

Park be established by the Secretary. The state took requisite measures to meet these expectations:

> The Committee has received assurances from the Governor and Attorney General that the State of Minnesota could and would make its lands available for the national park. (See telegram of December 19, following Departmental reports.) If this legislation is enacted into law, it is the desire of the committee that the State and its political subdivisions move without hesitation to donate these properties so that land price escalation of privately owned land will be minimal. If delays occur, creation of the park as presently envisioned may be jeopardized since the bill contains an appropriation authorization ceiling of $26,014,000 for land acquisition.

S. Rep. No. 91-1513, reprinted in 1970 U.S.C.C.A.N. 5965, 5967.

Senate Report No. 91-1513, dated December 21, 1970, placed the state on notice that the Secretary's authority would have to be recognized in the context of making appropriate and enforceable regulations for the park. In regard to the use of water craft in the proposed park, "[t]he Secretary should have adequate authority to make appropriate regulations in this regard." S. Rep. No. 91-1513, reprinted in 1970 U.S.C.C.A.N. 5965, 5968. Moreover, the Secretary's regulation in effect at the time the legislation was passed specifically gave the Secretary authority to regulate all business operations in VNP. See 36 C.F.R. § 5.3 (originally promulgated December 29, 1966 as 31 Fed. Reg. 16,660, 16,661). It was abundantly clear to all state legislators that if they voted to donate the state lands to the Secretary that VNP would be created, it would comprise not only 139,000 acres of land, but also the 80,000 acres of water in Rainy, Kabetogama, Namakin, Crane, and hundreds of smaller lakes. The state legislature had to have known that both the land and the water were necessary features of the proposed park, as the state's essential role in creation of the park was hotly debated in the legislature. Several amendments to the legislation were proposed, some of which would have killed VNP. See Voyageurs Bill Clears House Subcommittee, Duluth News-Tribune, April 28, 1971; Gene Lahammer, Park Bill

<u>Causes Shouting Match in Senate Committee</u>, The Daily Journal (International Falls, Minn.), Apr. 22, 1971.  All of these amendments were defeated.  A substitute proposal to create a state rather than a national park was likewise rejected by a substantial majority of the legislature.[2]

Neither Minnesota nor the United States expected or contemplated that the state would transfer its ownership of the lakes to the Secretary, but both understood that if the park were established, the park, including the waters, would be administered by the Secretary of the Interior in accordance with the general statutory authorities regarding the national park system.  <u>See</u> S. Rep. 91-1513, <u>reprinted</u> <u>in</u> 1970 U.S.C.C.A.N. 5965, 5965 (noting that proposed park would be "dominated by three large lakes" including Rainy).  Legislation passed by the Minnesota State Legislature in 1995,[3] eighteen years

---

[2]Contemporaneous with the vigorous and full debate accorded the legislation that would eventually become Minn. Stat. § 84B.01-.10, an alternative bill to create a Voyageurs State Park on the Kabetogama Peninsula was introduced to the Minnesota Senate and rejected.  <u>See</u> <u>State Measure Proposes Park At Kabetogama</u>, Duluth News-Tribune, Mar. 18, 1971.  Additionally, an alternative bill establishing a state planning commission to manage the land and waters in the Kabetogama, Namakin and Crane lakes area in Northern Minnesota was introduced to the Minnesota House of Representatives and rejected.  <u>See</u> <u>Bill Would Set Up Planning Unit for Kabetogama</u> <u>Area</u>, Duluth News-Tribune, Apr. 20, 1971.

[3] Minnesota statute § 84B.061 provides:

> [N]one of the navigable waters within the park and the lands under them have been donated to the United States.  These navigable waters include . . . Rainy . . . [L]ake[].  Pursuant to applicable federal and state law, navigable waters and their beds are owned by the state.  Ownership of and jurisdiction over these waters and their beds has not been ceded by the state, either expressly or implicitly, to the United States.

Minn. Stat. Ann. § 84B.061 (West 1999).

after our decision in <u>Brown I</u>, cannot alter the fact that the state consented to the NPS exercising jurisdiction over the waters of VNP in 1971. Once a state cedes jurisdiction of an area to the United States, it cannot unilaterally reassert jurisdiction. <u>See</u> <u>Paul v. United States</u>, 371 U.S. 245, 264 (1963); <u>United States v. Unzeuta</u>, 281 U.S. 138, 143 (1930); <u>Fort Leavenworth R. Co. v. Lowe</u>, 114 U.S. 525, 541-42 (1885); <u>Yellowstone Park Transportation Co. v. Gallatin County</u>, 31 F.2d 644, 645 (9th Cir.); <u>Rogers v. Squier</u>, 157 F.2d 948, 950 (9th Cir. 1946). Consequently, we now reaffirm our holding in <u>Brown I</u> that Minnesota ceded jurisdiction to the NPS over waters within the boundary of VNP.

## III.  Constitutional and Treaty-Based Challenges To Jurisdiction

While we understand Minnesota's cession of the lands and waters comprising VNP to foreclose any argument concerning Congress' power to unilaterally enact regulations governing commercial activity within the park, we nonetheless address these arguments in the interest of finality. Brown and Armstrong argue that Congress did not have the power under the Commerce and Property Clauses of the Constitution to enact 16 U.S.C. § 1a-2(h), authorizing the NPS to "promulgate and enforce regulations concerning boating and other activities on or relating to waters located within areas of the [NPS]." 16 U.S.C. § 1a-2(h) (1998). The district court properly ruled that Congress does have such authority and that it provides an "additional basis for jurisdiction" independent of the jurisdiction Minnesota ceded to the United States. (Memorandum and Order, at 4.)

In <u>Kleppe v. New Mexico</u>, 426 U.S. 529, 546 (1976), the Supreme Court held that Congress may make those rules regarding non-federal lands as are necessary to accomplish  its goals with respect to federal land. This court followed <u>Kleppe</u> in <u>Brown I</u>,  where we stated:

-11-

The crucial question is whether federal regulations can be deemed "needful" prescriptions "respecting" the public lands. This determination is primarily entrusted to the judgment of Congress, and courts exercising judicial review have supported an expansive reading of the Property Clause. In light of these general standards, we view the congressional power over federal lands to include the authority to regulate activities on non-federal public waters in order to protect wildlife and visitors on the lands.

552 F.2d at 822. We again followed <u>Kleppe</u> in <u>Minnesota by Alexander v. Block</u>, 660 F.2d 1240 (8th Cir. 1981). In <u>Block</u>, the state of Minnesota contended that Congress did not have the power to enact motorboat use restrictions on surface waters within a wilderness area. The district court rejected the state's claims and we affirmed, stating:

Under this [Property Clause-based] authority to protect public land, Congress' power must extend to regulation of conduct on or off the public land that would threaten the designated purpose of federal lands. Congress clearly has the power to dedicate federal land for particular purposes. As a necessary incident of that power, Congress must have the ability to insure that these lands be protected against interference with their intended purposes.

<u>Id.</u> at 1249.

We are unable to distinguish the facts here from those in <u>Kleppe</u>, <u>Brown I</u>, and <u>Block</u>. In each case, Congress invested the Department of the Interior with the power and authority to impose reasonable regulations with respect to conduct occurring within the boundaries of public lands under the department's control. Here, the regulation requiring that commercial tour boat operators obtain a permit before operating commercial tour boats within VNP is well within the authority of the NPS.

Not only is the regulation relating to the permitting system consistent with the purpose of VNP,

> to preserve, for the inspiration and enjoyment of present and future generations, the outstanding scenery, geological conditions, and <u>waterway system</u> which contributed a part of the historic route of the Voyageurs who contributed significantly to the opening of the Northwestern United States,

16 U.S.C. § 160 (emphasis added), but also Congress has specifically directed the NPS that,

> in accordance with the fundamental purpose of conserving their scenery, wildlife, natural and historic objects, and providing for their enjoyment in a manner that will leave them unimpaired for the enjoyment of future generations, the Congress hereby finds that the preservation of park values requires that . . . public accommodations, facilities, and services as have to be provided within [park system] areas should be provided only under carefully controlled safeguards against unregulated and indiscriminate use, so that heavy visitation will not unduly impair these values,

16 U.S.C. § 20.[4]

---

[4]Though constitutional analysis of the NPS regulation at issue here is appropriately aimed at Congress' power under the Property Clause, appellant's also forward a Commerce Clause argument. Their challenge of Congress' power is unconvincing. Congress' authority to regulate commerce and to delegate significant portions of this power to the Executive Branch is well established. <u>See</u> <u>United States v. Appalachian Power Co.</u>, 311 U.S. 377, 426 (1940); <u>California Bankers Ass'n v. Shultz</u>, 416 U.S. 21, 59 (1974).

Defendants additionally contend that regulation of tour boats in VNP violates the Root-Bryce Treaty of 1909, 36 Stat. 2448, and the Webster-Ashburton Treaty of 1842, Aug. 9, 1842, 8 Stat. 572.  The 1909 treaty provides:

> The High Contracting Parties agree that the navigation of all navigable boundary waters shall forever continue free and open for the purpose of commerce to the inhabitants and to the ships, vessels, and boats of both countries equally, <u>subject, however, to any laws and regulations of either country, within its own territory, not inconsistent with such privileges of free navigation and applying equally and without discrimination</u> to the inhabitants, ships, vessels, and boats of both countries.

36 Stat. at 2449 (emphasis added).[5]

We disagree with defendants' contention.  The treaties make clear that both the United States and Canada may adopt laws and regulations not inconsistent with the privileges of free navigation, so long as the laws and regulations are applied in a nondiscriminatory manner.  Certainly, requiring a tour boat operator in a national park to obtain a permit is not unreasonable and is not inconsistent with the privileges of free navigation.  Moreover, it is clear that the regulations are applied in a nondiscriminatory manner.  The regulation is equally applicable to American and Canadian citizens who seek to operate a business operation in VNP.

---

[5]Article II of the 1842 treaty states:

> It being understood that all the water-communications and all the usual portages along the line from Lake Superior to the Lake of the Woods; and also Grand Portage, from the shore of Lake Superior to the Pigeon River, as now actually used, shall be free and open to the use of the citizens and subjects of both countries.

Webster-Ashburton Treaty, Aug. 9, 1942, 8 Stat. 572, 574 (1842).

We face here with the same argument raised by defendants in <u>Block</u>, 660 F.2d at 1240, respecting the Boundary Waters Canoe Area. In that case, we concluded that the free and open provision of the treaties did not preclude either signatory to the treaties "from enacting reasonable regulations affecting commerce along the waterways, as long as the regulations apply equally to citizens of both countries." <u>Id.</u> at 1258. In reaching this decision, we gave weight to an opinion of the State Department which stated:

> We believe that the intent of the "free and open" provision for these waters was to ensure that this important route remained open, on an equal basis, to the nations of both countries. It would not be correct, however, to interpret "free and open" so broadly as to prohibit either United States or Canadian authorities from imposing any limitation upon the manner in which such waterways and portages may be used. In agreeing to free and open use of these waterways and portages, neither party intended to relinquish its sovereign role of imposing statutory limitations on behavior which would not be in the best interest of the respective country.

<u>Id.</u> at 1258 (quoting Letter from Robert J. McCloskey to Hon. James L. Oberstar) (<u>quoted</u> <u>in</u> <u>National Ass'n of Property Owners v. United States</u>, 499 F. Supp. 1223, 1234 (D. Minn. 1980)) (footnote omitted).

We find no relevant difference between the BWCA regulation which precluded motorized use, except on designated lakes and rivers, and VNP regulation which prohibits business operations in VNP, except pursuant to a permit or other written agreement with the United States.[6]

---

[6]At trial a park ranger testified that a Canadian tour boat would not violate 36 C.F.R. § 5.3 if it entered the Brule Narrows from the Canadian side of the border and exited back to the Canadian side of the border. This is a sensible interpretation of the regulation. <u>See</u> <u>Griffin v. Oceanic Contractors</u>, 458 U.S. 564, 575 (1982) ("A statute should be construed to make sense . . . ."); <u>Irving v. Clark</u>, 758 F.2d 1260, 1263 (8th

## IV. Sentencing

Brown contends that his fine and sentence are excessive and constitute cruel and unusual punishment under the Eighth Amendment to the United States Constitution. We disagree with one exception. One of the conditions of Brown's probation is that Brown have "no presence" in VNP except pursuant to the terms and conditions of any permits for the conduct of commercial operations granted to him by the NPS.

Brown makes two arguments as to why such conditions are violative of the Constitution. First, he states that his livelihood depends on his traveling through VNP as a federally-licensed tanker to deliver supplies to families on the lake. The short answer to this contention is that Brown can seek a permit from the NPS to operate his tanker delivery service. Thus, he will not be deprived of his livelihood if he meets VNP requirements for such a permit. Of course, Brown will have to do something that he does not want to do to obtain the permit – recognize the jurisdiction of the NPS over business operations in VNP – but we have resolved that issue and it is not a violation of either the Constitution or the sentencing guidelines to require that Brown submit to the permitting process if he desires to operate a commercial tanker delivering supplies to persons living within VNP.

Second, he states that it is cruel and unusual punishment to make it a condition of probation that he not enter VNP to pursue the same non-business activities that other visitors to VNP pursue. We agree. We understand that Brown has persisted for a long time in his quest to have the federal courts decide that the NPS is without authority to

_____

Cir. 1985). It allows a Canadian tour boat operator to use the narrows which are in American waters to pass from Canadian waters to Canadian waters without having to obtain an American permit. Here, however, Armstrong was several miles away from the Brule Narrows in American waters.

regulate commercial activities on the lake, but this fact is not a sufficient reason to deny Brown the same satisfaction that other visitors of VNP enjoy.

We affirm the district court with this one exception and remand the matter to the district court for the sole purpose of modifying the conditions of probation so as to permit Brown to visit VNP to engage in the same recreational and educational activities as other visitors to VNP.

## V. Remaining Issues

We have carefully reviewed the remaining issues raised by the parties and conclude that they are without merit.

## VI. Conclusion

We affirm the judgment and decision of the district court in all respects except as to the sentence of Brown and remand to the district court for the purpose of modifying his sentence.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT



APPENDIX I