# $\mathfrak{Staunton}$

## JAKE FLAX v. MONTICELLO REALTY COMPANY, ETC.

September 11, 1946.

Record No. 3100.

Present, Holt, Hudgins, Gregory, Browning, Eggleston and
Spratley, JJ.

The opinion states the case.

*Charles L. Kaufman* and *Hamilton Plack*, for the plaintiff in error.

*William L. Parker*, for the defendant in error.

BROWNING, J., delivered the opinion of the court.

This is an action in detinue to recover one pear-shaped diamond brooch or its alternate value of $3,750.00. The parties will be referred to in their proper names or as they were related in the trial court, that is, plaintiff and defendant.

The plaintiff, Jake Flax, came to Norfolk, Virginia, to testify for his friend, W. S. Wilder, who had a tax claim case pending in the United States District Court for the Eastern District of Virginia. Wilder and his witnesses were operatives or interested in the moving picture industry.

Flax occupied over night a room in the Monticello Hotel of which Col. Charles H. Consolvo was the managing head. Flax left his room on the morning of May 31 to attend the session of court and returned to the hotel in the afternoon, being the guest, with others, of Mr. Wilder for dinner served in the latter's suite. Before repairing to the suite he went to his room for the purpose of checking out for the boat leaving that afternoon. He noticed on the dresser in his room something wrapped in tissue paper. He took it and an examination disclosed the presence of the brooch in question. Flax, knowing nothing of its value, supposed it to be what is known as a piece of costume jewelry which is not of substantial intrinsic worth. Upon entering the room where dinner was about to be served, he showed the brooch to the assembled company. Mr. Wilder, having previously been in the jewelry business, perceived that it was an article out of the ordinary and declared that he believed it was genuine. To make sure, he suggested calling an expert from a nearby jewelry establishment to appraise the thing. The man called could not come so that Flax and Mr. Wilder

left the hotel apartment for the moment and went across to the jewelry store. There the man, who was an expert appraiser, told them that its value was between $3,750.00 and $4,000.00. Thus, the story takes on the flavor of Dumas' character of fabulous worth, the Count of Monte Cristo, which augmented the interest and curiosity of the assembled company.

The question arose what was to be done with the bejeweled ornament. Mr. Wilder suggested that Col. Consolvo be called and acquainted with the matter. He came, and Mr. Flax showed it to him, saying, "Is finding keeping?", which the Colonel negatived, saying, "I wouldn't say so. I don't quite understand what you are trying to convey to me." Flax then told him how he had come by the piece of jewelry. The suggestion of Col. Consolvo was that the only thing to be done was to place it in the custody of the hotel until it was called for by the true owner. He affirmed that it did not belong to Flax or the hotel. This disposition was assented to.

Here we come to a place in the story in which there is a conflict of testimony or a difference in understanding. The understanding of Flax and Mr. Wilder was that if the jewel was not called for within a reasonable time, after investigation, it was to be returned to Mr. Flax. Neither of these gentlemen testified to this in positive terms. It was simply their understanding. Col. Consolvo testified very positively that there was no such understanding and that there were no words or terms used from which such understanding could be deduced. Some of the other gentlemen who were present testified that such disposition of the thing was agreed to by Col. Consolvo. We do not think, however, that this is of any decisive moment because, as we shall presently see, Col. Consolvo under our view had no right or authority to make such agreement.

The jury rendered a verdict for the plaintiff, which was set aside by the court as contrary to the law and evidence, upon the motion of the defendant.

Mr. Flax called at the hotel several times to ascertain if

the owner of the brooch had made a claim for it. In the absence of such claim, he asserted a right to it, which was resented by the hotel, hence the suit.

Upon investigation, the hotel ascertained the name of the occupant of the room just prior to the occupancy of Flax, but up to that time he had not been located. Investigation revealed that the maid, who was employed by the hotel, upon dismantling the bed, thinking that Mr. Flax was about to check out, found the brooch, wrapped in tissue paper, in the crevice of the margin of the mattress. In accordance with the hotel instructions and custom, as the present occupant had not actually departed, she placed the article on the bureau, under the supposition that it belonged to him. Then occurred what we have described as having transpired.

Perhaps a variety of theories might be indulged as to why the article was concealed where it was and why it was overlooked and why no claim for it was subsequently made. This would take us into a realm of speculation, perhaps fruitful, perhaps not so. At least, its avoidance seems to be proper. The learned judge of the trial court rendered an opinion which is made a part of the record. It is brief and to the point, and we quote it in full:

"It is contrary to human experience that the owner of a $3,750.00 brooch would place it in a mattress in a hotel room and intentionally leave it there because of a desire no longer to possess it.

"On the other hand, the probability is so strong as to amount to proof that it was left at the hotel room as a result of inadvertence.

"Failure of the owner to make claim for it may be explained by a number of hypotheses more reasonable than that of voluntary abandonment.

"As the burden was on the plaintiff to prove his case by a preponderance of the evidence, his failure to do so is fatal to his case and there must be a final judgment for the defendant."

The rights of alleged finders of personal property have not infrequently been the subject of adjudications directly

and particularly in other jurisdictions. Almost every cited case has some peculiar feature which distinguishes it, in a more or less important degree, from another. The plaintiff in this case was not the finder of the jewel. He appropriated it and claimed it as his own. We may say at this time that the maid made no claim for it and does not do so. The claimant by mere coincidence found himself in an advantageous position to assert some sort of right thereto.

In the adjudications which we have found a very controlling circumstance as to the rightful authority and custody of the article is the control over the *locus in quo* in which the thing is found. The *locus in quo* here is, of course, a private room in the hotel of the defendant.

This court said in the case of *Crosswhite* v. *Shelby Operating Corp.*, 182 Va. 713, 30 S. E. (2d) 673, 153 A. L. R. 573:

"An innkeeper (as distinguished from a landlord) is in direct and continued control of his guest rooms."

Some of the cases have held that where money and bonds and packages of bills have been found in such public places as lobbies, dining rooms, halls and the like, to which the public has access, the finder is entitled to the property found, as against every one except the rightful owner, but a private room in a hotel or an inn is a very different *locus in quo*. As to mislaid and forgotten property, which, we think this unquestionably was, the innkeeper, as the custodian, owed a duty to the owner of the chattel. He is treated in some of the cases as representing the owner and has the paramount custody, notwithstanding any agreement as that alleged. This was the holding in the case of *Silcott* v. *Louisville Trust Co.*, 205 Ky. 234, 265 S. W. 612, 43 A. L. R. 28, where a thousand dollar Liberty Bond was found on the floor of a compartment, which the plaintiff was using, having rented a box from the defendant. He notified an officer of the defendant of his find or discovery and delivered the bond to him, upon

an express agreement that in the event the owner was not discovered within six months, the bank would return the bond to the plaintiff. Six months expired, and no claimant had appeared. The plaintiff demanded return of the bond, which was refused. He then sued. The holding of the court was against the plaintiff, as we have indicated.

The plaintiff in the case before us urged the contention that the defendant was his bailee and was thus estopped to deny its bailor's right to the possession of the brooch. It is probably enough to say that this contention was not made in the trial court, but its first appearance is here. On this point this court said in the case of *Union Indemnity Co.* v. *Small,* 154 Va. 458, 153 S. E. 685:

"In *Lloyd* v. *Norfolk, etc., Ry. Co.,* 151 Va. 409, 415, 145 S. E. 372, 374, it is said: 'It is a familiar rule of law that a plaintiff can only recover upon the case made by the pleading.' "

If the rule of law on the subject of bailment is present at all, it is found in the fact that the defendant occupied the position as bailee, *in invitum,* for the true owner of the chattel, and if it made the agreement alleged, it would constitute a breach of trust and would have been unenforceable.

As to the contention that the brooch was abandoned property, the observation of the learned trial judge is sufficient to refute it. A very pertinent excerpt is found in a passage in Pollock and Wright's Essay on Possession in the Common Law, p. 41, which we take from an article entitled The Rights of Finders of Lost Property, Ky. Law Journal, Vol. 16, pp. 3, 9:

" ' "The possession of land carries with it, in general, by our law, possession of everything which is attached to or under that land, and, in the absence of a better title elsewhere, the right to possess it also. And it makes no difference that the possessor is not aware of the thing's existence. . . . It is free to any one who requires a specific intention as part of a *de facto* possession to treat this as a

positive rule of law. But it seems preferable to say that the legal possession rests on a real *de facto* possession constituted by the occupier's general power and intent to exclude unauthorized interference."

" 'That is the ground on which I prefer to base my judgment. . . . . . It is somewhat strange that there is no more direct authority on the question; but the general principle seems to me to be that where a person has possession of house or land, with a manifest intention to exercise control over it and the things which may be upon or in it, then, if something is found on that land, whether by an employee of the owner or by a stranger, the presumption is that the possession of the thing is in the owner of the *locus in quo.*' "

The plaintiff, Flax, has no legal standing as a claimant to the brooch. Were he successful in his claim, in Biblical language, he would reap where he has not sown and would gather where he has not strawed, an abhorrent thought. The judgment of the trial court is plainly right and it is affirmed.

*Affirmed.*