Joan M. KLEIN, Plaintiff-Appellant,

v.

The UNIDENTIFIED WRECKED AND ABANDONED SAILING VESSEL, etc., Defendant-Appellee.

No. 83–5587.

United States Court of Appeals, Eleventh Circuit.

April 29, 1985.

David Paul Horan, Key West, Fla., David F. McIntosh, Corlett, Merritt, Killian & Sikes, P.A., Miami, Fla., for defendant-appellant.

Rebecca A. Donnellan, U.S. Dept. of Justice, Washington, D.C., for plaintiff-appellee.

\* Honorable James H. Hancock, U.S. District Judge for the Northern District of Alabama, sitting by designation.

1. Onion bottles are bottles peculiarly designed for use on board ships. The bottles are wide at the bottom with a narrow neck in order to avoid spilling.

Before KRAVITCH and HATCHETT, Circuit Judges, and HANCOCK \*, District Judge.

HANCOCK, District Judge:

While sport diving in the Biscayne National Park in 1978, Gerald Klein spotted a likely target for his spear. As he pursued his prey, it darted behind an object. One can only imagine his surprise when he discovered that the object in question was a cannon affixed to the remains of an 18th century English vessel. Equally surprising must have been the array of cutlasses, onion bottles [1] and other objects lying about in the area. In October of 1979, Mr. Klein brought the articles he removed from the wreck to the attention and custody of the district court. Klein thus began an action to declare himself rightful owner of the shipwreck, or alternatively to recover a salvage award for his efforts in removing the articles from the shipwreck. Following a bench trial, the district court, Judge C. Clyde Atkins presiding, found that plaintiff [2] was not entitled to either ownership of the shipwreck or to a salvage award. We affirm.

The factual background is summarized in the following findings of fact made by Judge Atkins:

1. Gerald Klein found the defendant wreck in the summer of 1978 while sport diving with some friends.

2. Gerald Klein first brought artifacts removed from the wreck to the attention and custody of this Court on October 4, 1979.

3. The remains of the vessel claimed by the plaintiff in this action lie entirely within the confines of Biscayne National Park and entirely within the submerged

2. Gerald Klein was originally the party plaintiff. Upon his death during the pendency of the action, Joan Klein, his widow and the personal representative of his estate, was substituted.

lands of the territorial sea of the United States.

4. The remains of the vessel claimed by plaintiff lie entirely in lands owned and administered by the United States as part of the national park system.

5. All of the artifacts removed from the remains of the vessel claimed by plaintiff, which are listed on an inventory of custodianship dated October 26, 1979, were removed from within the confines of Biscayne National Park and were found by Gerald Klein within the territorial sea of the United States.

6. The United States owns in fee simple the land in which the remains of the vessel claimed by plaintiff lie.

7. The United States has known of the existence and approximate location of the subject 18th century shipwreck located within Legare Achorage in the Biscayne National Park since at least 1975 and probably as early as 1970.

8. Although the government was aware of the existence of the defendant wreck and had documented its approximate location as early as February, 1975, it did not physically locate the wreck until July 4, 1980.

9. The remains of the vessel claimed by plaintiff are objects of antiquity being over 200 years old.

10. The remains of the vessel claimed by plaintiff are historic ruins revealing the remains of past human life and activities which are of archeological interest.

11. Before the filing of this action the United States did not know that Gerald Klein had removed artifacts from the wreck.

12. It is in the public interest that if artifacts are to be removed from the wreck the removal be conducted with scrupulous care.

13. The historic value of each artifact is enhanced by careful monitoring of archeological provenience, the exact location at which each item is found in terms of horizontal and vertical coordinates, the extent of burial, water depth and its spatial relationship to other items found.

14. Archeological provenience is not only important for the historical information that it provides, but it also adds to the value of the artifacts for donation or sale to interested buyers.

15. Gerald Klein neither applied for nor received a permit from the federal government or the State of Florida to excavate or remove artifacts or objects from the defendant wreck.

16. Before the filing of this action Gerald Klein did not notify the United States that he had removed artifacts from the wrecksite nor did he return those artifacts to the United States or its agents.

17. The United States had never initiated salvage activities on the defendant vessel before the initiation of this action.

18. The United States removed artifacts from the wreck after it was appointed custodian.

19. The State of Florida has voluntarily withdrawn from this action and has no right or title in the submerged lands in which the defendant wreck lies.

20. The artifacts removed from the wreck site by the United States are presently stored at the Southeast Archeological Survey Offices in Tallahassee, Florida.

Two issues are presented on this appeal. First, we review the district court's determination that the United States is the owner of the shipwreck. Second, we review the district court's determination that appellant is not entitled to a salvage award for the work done in removing articles from the shipwreck.

1. *Ownership of the vessel.*

Appellant argues that the subject shipwreck is rightfully hers under the maritime law which holds that one who discovers an abandoned wreck and reduces it to possession is entitled to it. The district court rejected the applicability of maritime law and applied the common law of finds, ruling that the United States was the owner of the shipwreck based on either of two exceptions to the law of finds. Appellant

further argues that even if the law of finds applies, the district court incorrectly applied it. We disagree.

■ The Fifth Circuit was faced with a question of ownership similar to that presented by the case at bar in *Treasure Salvors, Inc. v. Unidentified, Wrecked and Abandoned Sailing Vessel,* 569 F.2d 330 (5th Cir.1978).[3] In order to determine the ownership of a shipwreck on the outer continental shelf—outside the territorial waters of the United States—the Fifth Circuit relied on the law of finds instead of the maritime salvage law. The court reasoned that because application of maritime salvage law was predicated on the fiction that the owner of the wrecked vessel was still in existence, it would be absurd to apply maritime salvage law to a vessel whose very location has been lost for centuries. *Id.* at 337. Instead, the court held that title to abandoned property vests in the person who reduces that property to his or her possession. *Id. See also Treasure Salvors, Inc. v. Unidentified, Wrecked and Abandoned Sailing Vessel,* 640 F.2d 560 (5th Cir.1981); *Wiggins v. 1100 Tons, More or Less, of Italian Marble,* 186 F.Supp. 452, 456–57 (E.D.Va.1960). The common law of finds is the appropriate law to examine to determine the ownership of the shipwreck.

■ The common law of finds generally assigns ownership of the abandoned property without regard to where the property is found. Two exceptions to that rule are recognized: First, when the abandoned property is embedded in the soil, it belongs to the owner of the soil; Second, when the owner of the land where the property is found (whether on or embedded in the soil) has constructive possession of the property

such that the property is not "lost," it belongs to the owner of the land. *See Bishop v. Ellsworth,* 91 Ill.App.2d 386, 234 N.E.2d 49 (1968); *Allred v. Biegel,* 240 Mo.App. 818, 219 S.W.2d 665 (1949); *Flax v. Monticello Realty Co.,* 185 Va. 474, 39 S.E.2d 308 (1946); *Schley v. Couch,* 155 Tex. 195, 284 S.W.2d 333 (1955). *See also Elwes v. Briggs Gas Company,* 33 Ch. 562. Both exceptions operate to give the United States ownership in this case.

■ The ship is buried in the soil. The soil belongs to the United States as part of its national park system. In 1973, the land was transferred to the United States by the State of Florida for the purpose of allowing the United States to establish a national park area partially because of the historical value of the many shipwreck sites to be found in the area. When the United States acquired title to the land from Florida in 1973, it also acquired title to the shipwrecks embedded in that soil.

■ Since 1975 the United States has had constructive possession of the wreck by virtue of a Preliminary Archeological Assessment of Biscayne National Monument prepared for the Park Service. This assessment noted the presence of an 18th century shipwreck in the area of the wreck. Furthermore, the United States has had the power [4] and the intention [5] to exercise dominion and control over the subject shipwreck. Thus the United States has never legally lost the subject shipwreck and, as the owner of the land on and/or in which the shipwreck is located, it owns the shipwreck.

## 2. Salvage Award.

■ Failing in her efforts to acquire title to the shipwreck, appellant urges that she

3. The Eleventh Circuit, in the en banc decision *Bonner v. City of Pritchard,* 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

4. Congress has broad powers over all public lands pursuant to the Property Clause of the United States Constitution. *See Kleppe v. New Mexico,* 426 U.S. 529, 96 S.Ct. 2285, 49 L.Ed.2d 34 (1976).

5. One stated purpose of the National Park Act is the conservation of historic objects for the enjoyment of future generations. A vast matrix of statutes and regulations have been established toward that goal. See e.g., the Antiquities Act of 1906, 16 U.S.C. § 431; The National Park Service Act, 16 U.S.C. § 1; Archeological Resources Protection Act of 1979, 16 U.S.C. § 470aa; 36 C.F.R. §§ 1.11(a), 2.20(a)(1).

should be given a salvage award for the cost of recovering the articles from the wreck. A claim for a salvage award requires that three elements be shown:

(1) A maritime peril from which the ship or other property could not have been rescued without the salvor's assistance.

(2) A voluntary act by the salvor—that is, he must be under no official or legal duty to render the assistance.

(3) Success in saving, or in helping to save at least part of the property at risk.

G. Gilmore & C. Black, Jr., The Law of Admiralty 534–35 (1975); *See also Cobb Coin Co. v. Unidentified Wrecked and Abandoned Sailing Vessel,* 549 F.Supp. 540, 547 (S.D.Fla.1982).

■ Plaintiff's salvage efforts were directed toward a vessel that was not lost or suffering any marine peril. Indeed, the owner of the property may not even have desired for the property to be "rescued." When and if the United States determined it to be in the best interest of the administration of Biscayne National Park to remove the shipwreck, it was certainly capable of "rescuing" the property at that time without plaintiff's assistance. Furthermore, plaintiff's salvage efforts were not successful. The articles removed from the shipwreck site were not marked or identified so as to preserve their archeological provenience. As the district court points out "the plaintiff's unauthorized disturbance of one of the oldest shipwrecks in the Park and his unscientific removal of the artifacts did more to create a marine peril than to prevent one." The lower court correctly denied plaintiff's prayer for a salvage award. A contrary result would encourage persons to enter Biscayne National Park and to continue the unauthorized removal of articles from the various shipwrecks there located which were sought to be protected by the creation of that park.

Because we can find no error whatsoever in the conclusions or analysis of the district court, we affirm.

KRAVITCH, Circuit Judge, specially concurring in part and dissenting in part:

I agree with the majority's conclusion that the United States is the rightful owner of the shipwreck. In my view, however, such a conclusion is compelled not by the "embedded in the soil" and "constructive possession" exceptions to the common law of finds, which are of dubious relevance in the context of a sunken ship,[1] but rather by the Antiquities Act of 1906, 16 U.S.C. § 433. The Antiquities Act provides:

Any person who shall appropriate, excavate, injure, or destroy any historic or prehistoric ruin or monument, or any object of antiquity, situate on lands owned or controlled by the Government of the United States, without the permission of the Secretary of the Department of the Government having jurisdiction over the lands on which said antiquities are situated, shall, upon conviction, be fined in a sum of not more than $500 or be imprisoned for a period of not more than ninety days, or shall suffer both fine and imprisonment, in the discretion of the court.

*Id.* In the instant case, the shipwreck was found on submerged lands belonging in fee simple to the United States, and the vessel undoubtedly is an "antiquity."[2] Therefore, the Antiquities Act's prohibition of

---

1. In fact, both in its brief and at oral argument, the government eschewed reliance on these land-based exceptions to the common law of finds. The government argued instead that the district court's conclusion, that the shipwreck belongs to the United States, should be affirmed on the basis of various federal statutes.

2. The vessel is believed to be more than 240 years old. *United States v. Diaz,* 499 F.2d 113 (9th Cir.1974), in which the Ninth Circuit found the penal provisions of the Antiquities Act unconstitutionally vague, is thus distinguishable. In *Diaz,* the "antiquities" in question were only three or four years old. The instant case is much more similar to *United States v. Smyer,* 596 F.2d 939 (10th Cir.), *cert. denied,* 444 U.S. 843, 100 S.Ct. 84, 62 L.Ed.2d 55 (1979), in which the Tenth Circuit rejected a constitutional challenge to the Antiquities Act as applied to objects between 800 and 900 years old.

"appropriat[ion]" and "excavat[ion]" supersedes the principles of maritime law on which plaintiff relies, and defeats plaintiff's claim of ownership of the vessel.

At the same time, I respectfully dissent from that portion of the majority opinion holding that plaintiff is not entitled to a salvage award. The majority accepts the government's argument that the vessel "was not lost or suffering any marine peril." Yet it is undisputed that the government's 1975 survey of shipwrecks located in the Biscayne National Park misidentified the vessel in question and listed only its "approximate" location. In fact, the government was unable precisely to locate the vessel until July 4, 1980, some two years after plaintiff discovered it and a full nine months after plaintiff's discovery came to the government's attention.[3]

As to the existence of a "marine peril," in my view the majority opinion conflicts with *Treasure Salvors, Inc. v. Wrecked and Abandoned Sailing Vessel*, 569 F.2d 330 (5th Cir.1978), *aff'd in part and rev'd in part, on other grounds, sub nom. Florida Department of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 102 S.Ct. 3304, 73 L.Ed.2d 1057 (1982), in which this court's predecessor explained:

> The government's argument that no marine peril existed ignores the reality of the situation. Marine peril includes more than the threat of storm, fire, or piracy to a vessel in navigation.... There is no dispute that the [shipwreck] was lost. *Even after discovery of the vessel's location it is still in peril of being lost through the actions of the elements.*

*Id.* at 337 (emphasis added; footnotes and citations omitted). The *Treasure Salvors* rule applies even when the sunken vessel is "impervious to weather conditions above the surface of the sea," with "sand prevent[ing] deterioration underwater." *See Platoro Limited, Inc. v. Unidentified Remains of a Vessel*, 614 F.2d 1051, 1055 & n. 8 (5th Cir.1980); *see also Cobb Coin Co., Inc. v. Unidentified, Wrecked and Abandoned Sailing Vessel*, 549 F.Supp. 540, 557 (S.D.Fla.1982) ("It is established in this Circuit that a marine peril exists in an ancient, abandoned shipwreck for purposes of meeting the requirements of a valid salvage action.").[4]

Finally, I disagree with the majority's conclusion that plaintiff is not entitled to a salvage award because plaintiff's salvage efforts were "unsuccessful." Plaintiff performed a highly valuable service simply by locating the shipwreck, and should be compensated accordingly. The fact that plaintiff failed to employ proper archeological techniques in removing artifacts from the shipwreck may reduce the *amount* of any salvage award, but should not altogether deprive plaintiff of such an award. I therefore would remand this case to the district court for the purpose of calculating a salvage award based on the value of plaintiff's services in locating the vessel, reduced by any damage caused by plaintiff's unauthorized removal of artifacts from the vessel.

---

**3.** The record shows that, in early 1980, the government even went to court in an attempt to force plaintiff to divulge the exact location of the shipwreck. I find it hard to believe that the vessel was not "lost," when the government obviously had such difficulty finding it.

**4.** The Fifth Circuit recently has interpreted *Treasure Salvors* as holding that "marine peril existed *as a matter of law* where the ship's location was unknown." *Platoro Limited, Inc. v. Unidentified Remains of a Vessel*, 695 F.2d 893, 901 (5th Cir.) (emphasis added), *cert. denied,* —— U.S. ——, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983). The Fifth Circuit also rejected the government's argument that, for a salvage award to be justified, a vessel must still be in peril *after* its location is discovered. *See id.* at 901 n. 9. While this Fifth Circuit decision is not binding on our court, I find it persuasive, especially since it, like the instant case, involves the interpretation of former Fifth Circuit precedent.