**SARITEJDIAM, INC., Plaintiff–Appellee,**

v.

**EXCESS INSURANCE COMPANY, LTD., Insurance Company of North America (UK), Ltd., CIGNA Europe, Royal (UK) Insurance Company, Ltd., Ocean Marine Insurance Company, Ltd., Commercial Union Assurance Company, Ltd., London and Hull Insurance Company, Ltd., Northern Insurance Company, Ltd., Sovereign Insurance Company, Ltd., and Indemnity Marine Insurance Company, Ltd., Defendants–Appellants.**

**No. 1629, Docket 92–7202.**

United States Court of Appeals, Second Circuit.

Argued June 1, 1992.

Decided Aug. 4, 1992.

Louis M. Rohrberg, New York City (Levitan, Frieland & Cayea, of counsel), for defendants-appellants.

Gary H. Greenberg, New York City (Amelia A. Nickles, Orans, Elsen & Lupert, of counsel), for plaintiff-appellee.

Before: OAKES, Chief Judge,[*] NEWMAN and McLAUGHLIN, Circuit Judges.

OAKES, Chief Judge:

Excess Insurance Company, Ltd., et al., a consortium of London-based insurance companies, appeal from a judgment entered pursuant to an October 25, 1991 opinion and order of the United States District Court for the Southern District of New York, Mary Johnson Lowe, *Judge,* granting summary judgment for Saritejdiam, Inc. on a claim that its Jeweler's Block Policy covered the loss of loose diamonds valued at $267,514.30. 778 F.Supp. 148 (S.D.N.Y. 1991). For the reasons set forth below, we reverse and enter summary judgment for the appellants.

---

[*] After argument but before decision, Chief Judge Oakes became a Senior Circuit Judge.

## I. Background

Saritejdiam, Inc. (Saritejdiam) is a New York corporation involved in the wholesaling of diamonds and other precious and semi-precious stones and jewelry. In June 1988, Excess Insurance Company, Ltd., et al., (the Underwriters), a group of London-based insurance companies, issued an insurance policy to Saritejdiam. The policy is called a Jeweler's Block Policy and it insures against all risks of physical loss or damage to insured interests, unless specifically excluded by the policy. This appeal requires us to analyze whether Saritejdiam satisfied a clause in the policy requiring that insured interests remain in the "close personal custody and control" of the insured or its agent while in transit.

On May 13, 1989, Mr. Robert Danilin, an independent contractor/salesman for Saritejdiam, lost a package of loose diamonds valued by Saritejdiam at $267,514.30. On that day, Danilin, his wife, and stepson, were in Tuxedo, New York visiting a town house they had just purchased there. At approximately 5:50 p.m., the Danilins arrived at the Orange Top Diner on Route 17 in Tuxedo for dinner. Danilin brought a camera bag into the diner containing two stiff, black diamond wallets (one of which held Saritejdiam's diamonds), his checkbook, and credit cards. The three were seated at a table. Robert placed the camera bag on top of an empty chair to his left. During dinner, he touched the camera bag to make sure it was still on the chair. When they finished eating, Danilin paid the check with cash out of his pants pocket. The three then left the diner, got into their car, and headed for a golf driving range. When the Danilins reached their destination, they discovered that the camera bag containing the diamond wallet was not in the car. They sped back to the diner. The camera bag, however, was no longer on the chair where it had been previously placed.

Connie Grievas, the daughter of the proprietors of the Orange Top Diner, apparently witnessed the events that transpired after Danilin paid his bill. Grievas was eleven years old at the time. She told Danilin's stepson and, later on, investiga-

tors for the Underwriters that she went to clear Danilin's table after he paid his check. She noticed that a bag with a handle was left behind. Grievas then went to tell her mother that a customer had left a bag behind. Before she reached her mother, she saw two other customers, a man and a woman, take the bag and walk out. She described the man who picked up the bag as white, approximately forty years old, with shoulder-length black curly hair, standing 5'7", and wearing dark sunglasses. She described the woman as having blonde waist-length hair.

On the same day, Saritejdiam reported the loss to the Underwriters. On June 23, 1989, after investigating the claim, the Underwriters refused to cover the lost diamonds. The Underwriters claimed that Saritejdiam had not complied with the Personal Conveyance Clause of the insurance policy. The clause provides:

This Policy only covers the Insured interest in transit when in the *close personal custody and control* of the Assured and/or Assured's representative and/or agent at all times whilst in transit subject to hotel/motel clause, excluding all losses due to infidelity. (Emphasis added).

The denial letter states that "[t]he results of our investigation have revealed that there is no evidence that the theft took place whilst your property was in the close personal custody and control of your salesman, Robert Danilin."

Saritejdiam then filed a complaint on July 18, 1990, seeking to recover $200,000 from the Underwriters for breach of contract. The amount represents the maximum coverage under the policy for loss during transit. Saritejdiam also sought a declaratory judgment to establish the Underwriters' liability under the Jeweler's Block Policy. On February 8, 1991, the parties appeared before Judge Lowe for a pre-trial conference. During the conference, the district court asked plaintiff to distinguish the case *sub judice* from *Viviano v. Jewelers Mutual Ins. Co.*, 115 Misc.2d 518, 520–21, 454 N.Y.S.2d 404, 406 (Dist.Ct. Nassau Cty 1982). In that case, a

District Court in New York held that an insurance policy exclusion denying coverage if an insured article is lost when not in the "care, custody and control" of the insured was ambiguous and did not bar recovery for the loss of the insured's engagement ring, which the insured left behind on a restaurant bathroom sink. Following a brief argument on the impact of *Viviano*, the district court instructed Saritejdiam to move for summary judgment.

On March 8, 1991, Saritejdiam moved for summary judgment pursuant to Fed. R.Civ.P. 56. On October 25, 1991, Judge Lowe granted Saritejdiam's motion for summary judgment. 778 F.Supp. 148 (S.D.N.Y.1991). This appeal followed. In resolving the issues raised from a grant of summary judgment, "we review the record *de novo* to determine whether there are genuine issues of material fact requiring a trial." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.). *cert. denied*, —— U.S. ——, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991).

## II. Discussion

We must decide whether the loss of the diamonds at the Orange Top Diner occurred while they were in the "close personal custody and control" of Danilin, Saritejdiam's salesman/independent contractor. If so, Saritejdiam satisfied the requirements of the Personal Conveyance Clause in the policy, and the Underwriters must cover the loss.

In granting summary judgment for Saritejdiam, the district court concluded that the loss of the loose diamonds occurred while they were in Danilin's "close personal custody and control." In arriving at this conclusion, the district court relied heavily on the longstanding rule under New York law that ambiguous phrases in insurance contracts must be construed against the insurer. *See Lavanant v. General Accident Ins. Co. of Am.*, 164 A.D.2d 73, 80, 561 N.Y.S.2d 164, 168 (1990) ("It is a well-settled tenet of construction that any ambiguity in an insurance policy must be construed against the insurer."), *appeal dismissed*, 77 N.Y.2d 939, 569 N.Y.S.2d 612, 572 N.E.2d 53 (1991); *see also Viviano*, 115

Misc.2d at 520–21, 454 N.Y.S.2d at 406. The rule of construction exists because "[t]he terms of an insurance policy are usually what the insurance company chooses to make them." *Union Ins. Soc'y of Canton v. William Gluckin & Co.*, 353 F.2d 946, 951 (2d Cir.1965).

Specifically, the district court found that the requirement of "close personal custody and control" was susceptible to "several rational" interpretations. 778 F.Supp. at 152. For example, the district court believed that placing the diamonds on an adjacent chair in the diner within arm's reach was not "unequivocally" in violation of the Personal Conveyance Clause. *Id.* at 151. The district court concluded that if the Underwriters had more specific precautions in mind, they should have written the policy to make their understanding of the requirements explicit. *Id.* at 152. ("The defendants drafted the policy and had the opportunity to set the parameters and standards for each situation to be covered."); *cf. Viviano*, 115 Misc.2d at 522, 454 N.Y.S.2d at 407.

We agree with the district court that "close personal custody and control" is a phrase lending itself to several meanings and hence exhibits a degree of ambiguity. However, we think that a New York court would conclude that under any reasonable interpretation of the policy Saritejdiam's salesman relinquished "close personal custody and control" at least when he walked out of the diner door.

We reach this conclusion by analyzing the phrase "close personal custody and control" in light of longstanding personal property law concepts governing the rights to found property. The New York courts have applied these principles to adjudicate where the custody of property left behind by its owner lies. The issue traditionally arises in disputes over the rights of the finder against those of the owner of the real property on which the disputed personal property was found.

In resolving these disputes, the common law generally distinguished between "lost" and "mislaid" property. Property is mislaid when the owner purposely parts with

possession of the property, but then unintentionally leaves it behind. The distinction has been explained as follows:

> To lose is not to place or put anything carefully and voluntarily in the place you intend, and then forget it, it is casually and involuntarily to part from the possession; and the thing is then usually found in a place or under circumstances to prove to the finder that the owner's will was not employed in placing it there. To place a pocket-book, therefore, upon a table, and to omit or forget to take it away, is not to lose it in the sense which the authorities referred to speak of lost property....

*Foulke v. New York Consol. R.R.*, 228 N.Y. 269, 273, 127 N.E. 237, 238 (1920) (quoting *Lawrence v. State*, 20 Tenn. (1 Hum.) 220, 224 (1839)).

If property was classified as mislaid, custody was awarded to the owner of the *locus in quo*, who was considered a gratuitous bailee for the owner. *See, e.g. Foulke*, 228 N.Y. at 274, 127 N.E. at 238–39. If property was classified as lost, the custody rights depended on whether the property was found in a public or private place. *See generally* Ray Andrews Brown, *The Law of Personal Property* § 3.2 (3d ed. 1975); Note, *Legislation: Lost and Found Property: New York Personal Property Law Sections 251–258*, 44 Cornell L.Q. 427, 428–30 (1959) (hereinafter *"Legislation"*). Custody over lost property found in a public place was awarded to the finder. *See Bridges v. Hawkesworth*, 21 L.J. (Q.B.) 75 (1851); *Kalyvakis v. The T.S.S. Olympia*, 181 F.Supp. 32, 36 (S.D.N.Y.1960) (applying New York law). If, however, lost property was found in a private place, custody was awarded to the owner of the property where the lost property was found. *See, e.g. Silcott v. Louisville Trust Co.*, 205 Ky. 234, 237, 265 S.W. 612, 614 (1924); *Pyle v. Springfield Marine Bank*, 330 Ill.App. 1, 6, 70 N.E.2d 257, 260 (1946).

We believe that under New York common law the camera bag containing Saritejdiam's diamond wallets would be classified as mislaid property. Saritejdiam's sales-

man purposely placed the camera bag on the adjacent chair at his table in the Orange Top Diner. He then walked away from the table and forgot to pick up the camera bag. This is a paradigmatic example of mislaid property under New York's common law definition of the term.

Accordingly, we believe a New York court would hold that a person simply cannot maintain "close personal custody and control" over mislaid property. In fact, since 1920, New York courts have held that the true owner parts with custody over mislaid items. In the seminal case of *Foulke v. New York Consolidated R.R.*, 228 N.Y. 269, 127 N.E. 237 (1920), a passenger on a New York city subway car left behind a package at the 59th Street station which, unbeknownst to the parties at the time, contained only a five cent loaf of bread. A passenger seated across from the package picked it up and proceeded out of the car at the next station. A railway guard and the general trainmaster challenged the passenger's right to retain custody of the package. After the general trainmaster consulted with a police officer, the passenger holding the package was taken to the police station and charged with petit larceny. After the passenger was acquitted, he brought suit against the railroad for false imprisonment and malicious prosecution. A trial judge dismissed the complaint, and the Appellate Division affirmed the dismissal. In affirming the Appellate Division, the New York Court of Appeals explained that once the true owner of the package left the subway car without taking the package, "[the package] then had become in the custody and the potential actual possession of the [railroad]. It was the right of the [railroad] and its duty to become as to it and its owner a gratuitous bailee." *Foulke*, 228 N.Y. at 274, 127 N.E. at 238–39. *Cf. McAvoy v. Medina*, 93 Mass. (11 Allen) 548, 549, 87 Am.Dec. 733, 734 (1866); *Kincaid v. Eaton*, 98 Mass. 139, 141, 93 Am.Dec. 142, 143 (1867); *Foster v. Fidelity Safe Deposit Co.*, 264 Mo. 89, 102–03, 174 S.W. 376, 379 (1915); *Flax v. Monticello Realty Co.*, 185 Va. 474, 478, 39 S.E.2d 308, 311 (1946); *Jackson v.*

*Steinberg,* 186 Or. 129, 135, 200 P.2d 376, 378 (1948).

However, we must still determine *when* the camera bag was mislaid in order to determine the time at which the salesman relinquished close personal custody over the camera bag. Was the camera bag mislaid at the moment when Saritejdiam's salesman (a) walked away from the chair or (b) was no longer within arm's reach of the chair or (c) walked out of the diner door? The first two options are unsatisfactory because we cannot conclude unequivocally at what point Danilin was far enough away from the chair *while still within the diner* so as to have mislaid the property. We think reasonable minds could disagree over the requisite distance from the chair in order for the property to be deemed mislaid.

However, based on our survey of the decisional law, we feel safe in concluding that the camera bag was mislaid when the salesman walked out of the diner door. In the cases we reviewed where property was deemed mislaid, the true owner had clearly left the place of public accommodation. For example, in *Foulke, supra,* the owner of the package left behind had "alighted" from the subway car. In *McAvoy, supra,* the true owner had left the barbershop where the pocketbook at issue remained. In *Kincaid, supra,* a bank customer had "passed out" of the bank, leaving a pocketbook on a desk provided for the convenience of customers. *See also Foster,* 264 Mo. at 94, 174 S.W. at 377 (true owner left private room in bank provided for customers with safe deposit boxes, leaving behind an envelope containing $180); *Jackson,* 186 Or. at 132, 200 P.2d at 377 (hotel maid found eight one-hundred dollar bills under the paper lining of a dresser drawer left behind by a guest who had already checked out of the hotel); *Flax,* 185 Va. at 474–76, 39 S.E.2d at 309–10 ("bejeweled ornament" left behind in a hotel room by a guest who had already checked out); *Silcott,* 205 Ky. at 235, 265 S.W. at 613 (one thousand dollar Liberty bond left on floor of a bank vault by a customer who had already left the bank). Thus, we have no doubt that Danilin relinquished "close personal custody

and control" when he walked out of the diner door. At that point, the camera bag was mislaid and, as we have established, New York courts have long held that a true owner does not maintain custody over mislaid property, much less "close personal custody."

In drawing this conclusion, we are aware that in September of 1958, the New York State Legislature passed a statute simplifying adjudication of the rights to found property by eliminating the need for courts to apply the common law distinction between lost and mislaid property. N.Y.Pers.Prop.L. §§ 251–258 (McKinney 1976 & Supp.1992); *see also* Note, *Legislation, supra,* 44 Cornell L.Q. at 430–33; *see also* Comment, *Legislation: Personal Property—Lost and Found Property,* 25 Brook.L.Rev. 311 (1959). Problems arose with the common law scheme in deciding (1) whether property was mislaid or lost because the classification turns on the mindset of the true owner, *see* Brown, *Personal Property, supra,* at § 3.4 at 29 ("The doctrine of misplaced goods is apt to be artificial, difficult to apply, and doubtful in principle"), and (2) whether the property, if lost, was found in a public or private place. *See* Note, *Legislation, supra,* 44 Cornell L.Q. at 428–30. In the eyes of the legislature, this murky system neither encouraged the reporting of found property nor facilitated recovery by the owner. *Id.* at 430.

The statute passed in 1958 establishes that the first to take possession of the property is the finder, and places on the finder the obligation within ten days to either return the property to the owner or to report and deposit the found property with the police in the city where the property was found. N.Y.Pers.Prop.L. §§ 251, 252(1) (McKinney 1976 & Supp.1992). The finder is entitled to the property after a designated period of time elapses if the owner does not make a claim, assuming the finder satisfies certain statutory conditions. N.Y.Pers.Prop.L. §§ 253(7), 254. More important, the statute defines lost property to "include[ ] lost or mislaid property," thereby eliminating the need to apply the com-

mon law distinction in such cases. N.Y.Pers.Prop.L. § 251(3).

The statute does not, however, undercut the notion that the true owner does not maintain custody over mislaid items. The statute simply establishes a blanket rule that custody over found property lies with the finder, and imposes statutory obligations within ten days after the finding to either return the property to the owner or report and deposit the found property with the police in the city where the finding occurred.

Given our conclusion that Saritejdiam's salesman relinquished "close personal custody and control" over the camera bag when he walked out of the diner door, all that remains to be determined is whether the stranger who picked up the camera bag did so after Danilin left the diner. If the camera bag were taken at any point after Danilin walked out the diner door, then the loss is not covered. Based on the statement of Connie Grievas, the then eleven-year-old eyewitness, we are confident in concluding that Danilin had indeed left the diner when the camera bag containing the loose diamonds was taken. The fact that she went to tell her mother that a customer had left behind a bag makes the inference that the customer had left the diner the only reasonable one; otherwise she would have told the customer himself.

For the foregoing reasons, we reverse the order of the district court granting summary judgment for Saritejdiam and enter summary judgment for the Underwriters.

McLAUGHLIN, Circuit Judge, dissenting:

We are unanimous that the central question in this case is whether the diamonds were lost while in the "close personal custody and control" of Danilin. The majority concludes that the loss occurred "when the salesman walked out of the diner door;" and because he was obviously no longer in close personal custody and control of the diamonds at that point, there is no insurance coverage. In my view the loss occurred when Danilin left his table at the diner, a point when he was still in close personal custody and control of the diamonds, and thus there is coverage.

As the majority concedes, the phrase "close personal custody and control" is capable of more than one interpretation, and thus must be construed against the Underwriters, who drafted the policy. *See, e.g., United States Fidelity & Guarantee Trust Co. v. Annunziata,* 67 N.Y.2d 229, 232, 501 N.Y.S.2d 790, 791, 492 N.E.2d 1206, 1207 (1986). Applying this rule of contract interpretation, the majority reasons that Danilin relinquished "close personal custody and control" of the diamonds when he walked out of the diner, and concludes that the diamonds were lost at this time. I do not question the majority's reading of the phrase "close personal custody and control." I do, however, believe that it is just as reasonable to conclude that Danilin "lost" the diamonds the moment he left his table at the diner. Thus, because he was in close personal custody and control of the diamonds at that time, there is coverage. To hold that there was no loss until Danilin actually left the diner is to interpret the policy in a light most favorable to the Underwriters, and to ignore an equally reasonable interpretation that favors the plaintiff. Therefore, I respectfully dissent.

The common law distinguished between "lost" property and "mislaid" property. A chattel was "lost" when the owner involuntarily parted with possession of it. *Foulke v. New York Consolidated R.R. Co.,* 228 N.Y. 269, 274, 127 N.E. 237, 238–39 (1920). Property was "mislaid" when the owner purposely parted with possession of an object, but then forgot to take the object with him. *See Cohen v. Manufacturers Safe Deposit Co.,* 297 N.Y. 266, 269, 78 N.E.2d 604, 606 (1948). The majority correctly points out that common law would regard the diamonds as mislaid, because Danilin intentionally left them on a chair adjacent to his table, and then forgot to take them when he finished his dinner.

I am baffled, however, as to why the majority painstakingly analyzes whether the diamonds were "lost" or "mislaid."

Quite apart from the fact that the distinction has been statutorily abolished in New York, *see* N.Y.Pers.Prop.L. § 251, a close examination of the majority opinion reveals that the lost-mislaid distinction has little bearing upon the majority's interpretation of the policy.

The majority states that the diamonds were mislaid, and that under New York law an owner parts with "custody" when property is mislaid. According to the majority, then, the moment Danilin mislaid the diamonds in the diner, they were no longer in his "close personal custody and control," and thus there is no coverage under the policy. However, the majority does not take its argument to its logical conclusion. The majority notes that the custody of property also shifts when a chattel is "lost." Therefore, under the majority's interpretation, even if the diamonds were "lost" in the diner (e.g., if they fell through a hole in Danilin's pocket while he sat at the table), Danilin would no longer have custody of the diamonds at the time of the loss (i.e. when he exited the diner), and the diamonds would be uninsured. Thus, the majority's interpretation precludes coverage regardless of whether the diamonds are "lost" or "mislaid." This is an overly restrictive reading of an admittedly ambiguous policy, and, I believe, contravenes the principle that ambiguities must be resolved against the Underwriters, who drafted the policy.

According to the *Oxford English Dictionary*, a "loss" is "the being deprived of, or the failure to keep [ ] a possession, appurtenance, right, quality, faculty, or the like [ ]." 9 The Oxford English Dictionary 37 (2d ed. 1989). Similarly, *Black's Law Dictionary* defines a "loss" as "the act of losing," and defines "lose" as " . . . to part with, especially in an accidental or unforeseen manner." Black's Law Dictionary 851 (5th ed. 1979). Thus, a "loss" occurred when Danilin inadvertently left the table without the diamonds, and at that point he was still in "close personal custody and

control" of the diamonds. Accordingly, the diamonds should be covered under the policy.

In the final analysis, the gulf that divides us is, not the lost-mislaid distinction, nor even the close personal custody and control concept, but the question: when did the loss (for insurance purposes) occur? The majority appears to settle upon the moment Danilin left the diner. I believe there was a loss when Danilin left the diner table, regardless of when the subsequent theft occurred or, indeed, even if there was no theft. At the very least, the question is arguable and thus should be resolved in favor of the insured who had no hand in the drafting of the insurance policy.[1]

Lurking in the majority's opinion seems to be the implication that the loss is not covered because Danilin casually left the diamonds on an adjoining chair while the family had dinner. The Underwriters may, indeed, have intended to deny coverage unless Danilin kept the diamonds on his person at all times. Certainly, such an intention would not be unreasonable given the great value of the diamonds. However, the policy does not state this intention. Moreover, as the district court noted, other parts of the policy do list specific requirements for coverage. *See Saritejdiam, Inc. v. Excess Insurance*, 778 F.Supp. 148, 152 (S.D.N.Y.1991).

Because the policy must be construed against the Underwriters, and because I believe that a "loss" occurred when Danilin surrendered "close personal custody and control," I would affirm the judgment of the district court, and hold the Underwriters liable on the policy.

I respectfully dissent.

---

**1.** Curiously, the majority acknowledges that the closest New York case on point is contrary to the majority result. *See Viviano v. Jewelers Mut. Ins. Co.*, 115 Misc.2d 518, 454 N.Y.S.2d 404 (Dist.Ct.Nassau County 1982). While citing the case, the majority makes no attempt to distinguish it.