**SEA SERVICES OF THE KEYS, INC., a Florida Corporation, d/b/a Sea Tow Islamorada, Plaintiff,**

**v.**

**THE ABANDONED 29′ MIDNIGHT EXPRESS VESSEL, and Two (2) 200HP Mercury Offshore Outboard Motors, No. OD213890 and No. OD222754, and all tackle and appurtenances salvaged from the vessel, in rem, Defendant.**

**No. 96–10119–CIV.**

United States District Court, S.D. Florida.

May 18, 1998.

David Paul Horan, Key West, FL, for Plaintiff.

Paulette R. Taylor, Assistant Attorney General, Miami, FL, for Defendant.

### ORDER GRANTING SUMMARY FINAL JUDGMENT FOR PLAINTIFF

JAMES LAWRENCE KING, District Judge.

THIS CAUSE comes before the Court upon Plaintiff's Motion for Summary Judgment, filed April 28, 1998. The State of Florida Department of Environmental Protection ("Department") filed a response on May 11, 1998.

#### Factual Background

This case arises from a dispute over ownership rights to the Defendant vessel. Plaintiff claims ownership of the vessel under the law of finds and, alternatively, the law of salvage, asserting that it took possession of an abandoned vessel or salvaged the vessel when it was in a condition of marine peril. The Department contends that the vessel was neither abandoned nor in marine peril and that it is the rightful owner of the vessel due to the vessel's status as contraband.

The evidence before the Court consists of Plaintiff's Verified Complaint, Affidavits of Gene Mincey ("Mincey") and Steven Rieke ("Rieke") (attached to Dep't's Mot. for Summ. J.), and an Affidavit of Lt. George Steinmetz ("Steinmetz") (attached to Dep't's Mot. to Dismiss). Plaintiff states the following in its Verified Complaint: On October 7, 1996, at approximately 9:30 a.m., Plaintiff set out to retrieve the Defendant vessel after having received a call over VHF radio reporting an abandoned vessel. Before leaving

port to locate the vessel, Plaintiff's captain informed the Florida Marine Patrol of the vessel's existence. After the Patrol responded that it did not have boats available to salvage the Defendant vessel, Plaintiff's captain stated that he would respond to the vessel. When Plaintiff's captain contacted the Coast Guard, it informed him that it had turned the matter over to the Florida Marine Patrol. According to Plaintiff, the marine conditions were "dangerous," consisting of five to seven foot seas and winds 15–20 MPH, with gusts of 25 MPH. When Plaintiff located the Defendant vessel, it was tied to a lobster trap and taking waves across its bow. The bow was down and the engines were rising out of the water with each successive wave. The boat had taken at least one foot of water, and the amount increased with every wave. Plaintiff's captain estimated that the vessel would sink within minutes. Plaintiff, at great personal risk, managed to tow the vessel to shore, purging the water out over the transom as it moved the vessel forward. One of Plaintiff's captains was injured in the process. During the tow, Plaintiff's captain noticed that the vessel's bilge switches were in the "off" position. Plaintiff summarizes that at its own risk, in perilous conditions, it saved the Defendant vessel from total loss.

The affidavits of Mincey and Rieke state the following: On October 7, 1996, at approximately 7:30 a.m., Mincey and Rieke were checking their lobster traps when they discovered the Defendant vessel tied to one of Mincey's traps. At that time, the boat was secured to the lobster buoy, with its bow toward the waves and engines out of the water. The bilge pumps were on, and there was no water in the boat. The boat did not appear to Mincey to have any physical damage. Mincey did notice, however, that there were no Florida registration numbers on the boat. Mincey and Rieke observed that the weather conditions were "rough," and that the seas were up to five feet. The men observed the boat for approximately one hour and then called the Florida Marine Patrol. Mincey could have towed the boat, but chose not to do so "because, in [his] experience, the circumstances under which [he] found the boat indicated to [him] that it could have been involved in some type of illegal activity."

Finally, there is Steinmetz's affidavit, which was originally presented to the Court in conjunction with the Department's Motion to Dismiss but is now being relied upon by Plaintiff. Plaintiff asserts that Steinmetz's affidavit confirms that the weather conditions were adverse. Steinmetz does state that there were "adverse weather conditions" and "dangers of boarding a vessel of this type." He further states, "Due to the weather conditions I felt that it would be prudent for U.S.C.G. to respond in there [sic] 41 foot vessel."

### Legal Standard

Summary judgment is appropriate only where it is shown that no genuine dispute as to any material fact exists and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In ruling on the moving party's motion, the court must view the evidence in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court "should 'resolve all reasonable doubts about the facts in favor of the non-movant' and draw 'all justifiable inferences ... in his favor.'" *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir.1991)(alteration in original) (citation omitted).

Initially, the moving party bears the burden of pointing to that part of the record which shows the absence of a genuine issue of material fact. If the movant meets its burden, the burden then shifts to the non-moving party to establish that a genuine dispute of material fact exists. *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 918 (11th Cir.1993). To meet this burden, the non-moving party must go beyond the pleadings and "come forward with significant, probative evidence demonstrating the existence of a triable issue of fact." *Chanel, Inc. v. Italian Activewear of Florida, Inc.*, 931 F.2d 1472, 1477 (11th Cir.1991). If the evidence relied on is such that a reasonable jury could

return a verdict in favor of the non-moving party, then the court should refuse to grant summary judgment. *Hairston,* 9 F.3d at 919. However, a mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment. *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505.

### Discussion

Because the Court finds that Plaintiff has acquired title to the Defendant vessel under the common law of finds, the Court need not address whether there are any disputed issues of material fact as to the existence of marine peril. "[U]nder the law of finds, a finder acquires title to lost or abandoned property by 'occupancy,' i.e. by taking possession of the property and exercising dominion and control over it." *Treasure Salvors, Inc. v. Unidentified Wrecked & Abandoned Sailing Vessel,* 640 F.2d 560, 571 (5th Cir.1981). Thus, in order for a party to be entitled to ownership under the law of finds, the vessel must have been "abandoned" by its previous owner. "Dereliction or renunciation of property requires both the intention to abandon and external action. . . . There must be a voluntary intention to abandon, or evidence from which such intention may be presumed." *The No. 105,* 97 F.2d 425, 426 (5th Cir.1938). Clearly, the original owner of the Defendant vessel intended to abandon the boat. The boat was tied to a stranger's lobster trap and left alone in rough seas. There were no identifying papers on the boat. The abandoning party made no effort to reclaim the boat and had even gone so far as to scratch off the Florida registration numbers. Even the Department observed that "the vessel was 'abandoned' because the true owner cannot be located. All of the identification numbers were removed from the vessel. Consequently, the true identity of the vessel cannot be determined." (Dep't's Mem. in Opp'n to Pl.'s Mot. for Summ. J., at 6).

The Department contends, however, that even though the original owner abandoned the vessel, the vessel was taken into possession by Mincey and thus was not abandoned when Plaintiff towed it to shore. This Court finds, however, that Mincey did not actually or constructively possess the Defendant vessel so as to destroy its abandoned status. First, Mincey did not actually possess the vessel. "The law of finds, a common law doctrine, dictates that the finder of abandoned property must continuously possess or be in the process of reducing to possession the property which he has found." *MDM Salvage, Inc. v. Unidentified Wrecked & Abandoned Sailing Vessel,* 631 F.Supp. 308, 311 (S.D.Fla.1986). "It is well established that a finder does not acquire title merely on the strength of his discovery of lost or abandoned property." *Treasure Salvors,* 640 F.2d at 571. Rather, title accrues only if "a first finder maintains appropriate possession and control." *MDM Salvage, Inc.,* 631 F.Supp. at 311. The affidavits of Mincey and Rieke clearly show that Mincey has not acquired to title of the vessel. Mincey undertook no efforts to tow the vessel to shore. Mincey did not in any way attempt to possess the vessel. In fact, Mincey states in his affidavit that he intended to leave the vessel alone because he thought it might have been involved in illegal activity. In the absence of an intent to possess the vessel, Mincey cannot be held to divest the vessel of its abandoned status. *See The No. 105,* 97 F.2d at 426 (finding award of title inappropriate where "[t]here was no evidence before the court indicating [the] intention [to possess]."). A finding that under these circumstances Mincey possessed the Defendant vessel would contravene the policies behind the common law of finds. As the former Fifth Circuit has explained:

> Although cases involving the principles of the law of finds are few and far between, we think that a basic principle emerges with some clarity from the cases which have considered problems similar to the one presented here. Persons who actually reduce lost or abandoned objects to possession and persons who are actively and ably engaged in efforts to do so are legally protected against interference from others whereas persons who simply discover or locate such property, but do not undertake to reduce it to possession are not. This principle reflects a very simple policy to afford protection to persons who actually

endeavor to return lost or abandoned goods to society as an incentive to undertake such expensive and risky ventures; the law does not clothe mere discovery with an exclusive right to the discovered property because such a rule would provide little encouragement to the discoverer to pursue the often strenuous task of actually retrieving the property and returning it to a socially useful purpose and yet would bar others from attempting to do so. *Treasure Salvors,* 640 F.2d at 572.

 The Department argues that, despite the fact that Mincey did nothing to return the Defendant vessel to society, Mincey constructively possessed the vessel because it was tied to his lobster trap. However, "[t]he common law of finds generally assigns ownership of the abandoned property without regard to where the property is found." *Klein v. Unidentified Wrecked and Abandoned Sailing Vessel,* 758 F.2d 1511, 1514 (11th Cir.1985). There is an exception to this general rule that occurs "when the owner of the land where the property is found (whether on or embedded in the soil) has constructive possession of the property such that the property is not 'lost,' it belongs to the owner of the land." *Id.* Constructive possession of a land owner is not established from the mere fact that a vessel is affixed to his land. Rather, constructive possession is establish only when the land owner has the power to possesses the vessel and the *intention* to exercise control over it. *See* 1 Am. Jur.2d *Abandoned, Lost, and Unclaimed Property* § 18 (1994) ("Constructive possession, for this purpose, is generally defined as knowingly having both the power and intention, at a given time, to exercise dominion or control over the property."). The Department relies on *Klein* to support the proposition that Mincey had constructive possession of the Defendant vessel. In *Klein,* however, the Eleventh Circuit found that the United States had clearly displayed an intent to possess a shipwreck embedded in its soil. 758 F.2d at 1514. It observed:

> Since 1975 the United States has had constructive possession of the wreck by virtue of a Preliminary Archeological Assessment of Biscayne National Monument prepared for Park Service. This assessment noted the presence of an 18th century shipwreck in the area of the [defendant] wreck. Furthermore, the United States has had the power and the intention to exercise dominion and control over the shipwreck. Thus the United States has never legally lost the subject shipwreck and, as the owner of the land on and/or in which the shipwreck is located, it owns the shipwreck.

*Id.* The case at bar is completely distinguishable from *Klein.* First, there are the obvious, but perhaps technical, factual differences. Whereas in *Klein,* the vessel was embedded in the United States' land, in the instant case the vessel was merely tied to a lobster trap owned by Mincey. Furthermore, in *Klein* the defendant vessel had been embedded in the United States' land for hundreds of years. In the instant case, the vessel had been recently tied to the lobster buoy when Mincey discovered it. The more important distinction is that Mincey did not possess the requisite intention to exercise dominion over the Defendant vessel. As observed above, Mincey's affidavit clearly shows an intention not to possess the vessel in fear that it was involved in illegal activity. A property owner who discovers a vessel affixed to his property and then himself abandons the vessel cannot be said to have, by virtue of owning the property, constructively possessed that vessel. Because the Court concludes that the vessel was abandoned and subsequently possessed by Plaintiff, it need not address the issue of whether or not marine peril existed so as to justify a salvage award.[1]

---

1. The Court notes that Plaintiff would most likely be entitled to summary judgment under the law of salvage. The parties do not dispute that the conditions were dangerous and that Plaintiff, at its own peril, undertook to rescue the Defendant vessel. The Department presents evidence that the boat was not in danger of sinking at 8:30 a.m. because its bow was in the wind and rising and falling with the waves. The Department does not, however, present any evidence to contradict Plaintiff's evidence that the vessel was in peril of sinking at 10:00 a.m. Given the "rough" conditions, a boat's condition can easily change from safe to disastrous in a matter of minutes, depending on the force and direction of the wind, waves, and tide. Furthermore, as Plaintiff points out, any prolonged exposure of the outboard motors to sea water will lead to corrosion

### Conclusion

The State of Florida, for over a year and a half and at taxpayer expense, has fought to retain possession of this twenty-nine foot vessel, which it never undertook efforts to salvage, tow, or restore. Plaintiff, at its own personal risk, battled the elements to return the Defendant vessel to a condition useful to society, only to later find itself having to wage another battle with the state to retain the fruits of its labor:

> As grave as the perils of sea are and were, the gravest perils to the treasure itself came not from the sea, but from two unlikely sources. Agents of two governments, Florida and the United States, who have the highest responsibility to protect the rights and property of citizens, claimed the treasure as belonging to the United States and Florida.... It would amaze and surprise most citizens of this country, when their dream, at the greatest of costs, was realized, that agents of their respective governments would, on the most flimsy of grounds, lay claim to the treasure.

*Treasure Salvors, Inc. v. Unidentified, Wrecked and Abandoned Sailing Vessel,* 459 F.Supp. 507, 511 (S.D.Fla.1978).

Accordingly, after a careful review of the record, and the Court being otherwise fully advised, it is

ORDERED and ADJUDGED that Plaintiff's Motion for Summary Judgment be, and the same is hereby, GRANTED. Final Judgment be, and the same is hereby, ENTERED in favor of Plaintiff.

of the engine parts and possibly permanent destruction of the outboard motors.